## C. E. CLARK v. ST. LOUIS & SUBURBAN RAILWAY COMPANY, Appellant.

**In Banc, May 9, 1911.**

1. **SEPARATE TRIALS: In Civil Case.** Where a street railway company owned the electric wires attached to the pole, which the foreman of an independent contractor, employed to construct a coal chute for said railway company, ordered a servant of said contractor to mount, and to adjust above the wires a guy rope, and in doing so the steel block of the rope came in contact with one of the defectively insulated wires, while his foot rested upon another, thereby causing a "short circuit" of the electricity through his body and injuring him, the court does not abuse its discretion, when both the railway company and the independent contractor are jointly sued, by one petition charging separate acts of negligence, in refusing to grant the railway company a separate trial.

2. ———: ———: **Separate Challengers of Jurors.** Where the court did not err in refusing one of the defendants a separate trial in the civil case, it did not err in refusing to impanel twenty-one jurors, and to permit said defendant to challenge three of them. Said defendant was not entitled to three challenges. All the defendants are jointly entitled to that number.

3. NEGLIGENCE: Employee of Independent Contractor: Proximate Cause. A street railway company which owned the heavily charged electric wires attached to a pole, which the foreman of an independent contractor, employed to construct a coal chute for said railway company, ordered a servant of said contractor to mount, and to adjust and to attach a guy rope thereto above the wires, and who in doing that work was injured by the steel block of the rope coming in contact with one of the defectively insulated wires, while his foot rested upon another, thereby causing a "short circuit" of the electricity through his body, is liable for the injuries to said servant due to the failure of the railway company to insulate said wires, and that failure was the proximate cause of his injury.

4. ———: ———: Implied Invitation to Use. The railway company, by contracting with the independent company to construct the coal chute upon its premises near the pole and for its use, thereby impliedly agreed with such contractor that he might take all the employees he needed upon the premises to assist him in the work; and upon a showing that the servant was engaged in the work, under his master's direction, and was rightfully in the place where a performance of the work required him to be, and that the wires were not insulated at all, but were simply covered with some weather-proof substance, he made out a prima-facie case, and the railway company's demurrer was properly overruled.

5. ———: Contributory Negligence: Contradictory Evidence. Where there was much evidence tending to show that plaintiff was exercising due care at the time he was injured, and also much evidence tending to show that his conduct was negligent, and in consequence thereof he was injured, the question of his contributory negligence becomes one of fact, for the jury to determine.

6. ———: Electric Wires: Ordinary Care. A street railway is not absolved from liability to a person in a place where he has a right to be by using ordinary care to have its wires, heavily charged with electricity, so insulated that they will not injure such person, or by using ordinary care to prevent persons from being injured by the electricity hidden in the wires at all places where they have a right to go for business or pleasure. Its duty to one not its servant is to use more than ordinary care—its duty is to use the utmost care and foresight.

7. ———: Instruction Between Defendants. An instruction given at the request of one defendant cannot be held to be erroneous as against plaintiff, although it may be erroneous as against another defendant who appeals.

8. ———: Respondeat Superior: Independent Contractor's Servant: Warning. Where the street railway company had posses-

Clark v. Railroad.

sion and control of the pole and of the wires connected by a cross-arm to the pole, and the servant of the independent contractor, employed by the company to erect a coal chute near the pole, in an attempt, under the direction of his master, to attach a guy rope to this pole, was at a place on the cross-arm where his duty required him to be, and while in the performance of that duty the steel block of the guy rope, in his hand, came in contact with a non-insulated wire, while his foot rested upon another such wire, thereby producing a "short circuit" through his body, the street railway company is liable for his injuries. It was the duty of the street railway company to exercise the utmost care and precaution to know that the contractor's servants, in the performance of their duties, might come in close proximity to the dangerous wires; and it cannot excuse itself by a showing that it had no control over the independent contractor, and had given him notice and warning not to use the pole or wires or permit his servants to come in contact with them.

9. **EXCESSIVE VERDICT**: $20,000. Plaintiff, as a result of coming in contact with heavily charged electric wires, has lost the use of both hands, except a thumb and index finger on the left; his legs are stiff and the upper parts of his feet burned away; the flesh on the lower parts of the arms, on the inside of the hands, on the feet, and certain portions of the legs was burned away and cannot be restored; his kidneys were injured; when the current of electricity passed through his body, the blaze shot out through his nose, mouth and eyes; he suffered most excruciating pains for months; he is a helpless cripple and cannot feed or dress himself; he has contracted debts for medicine, nurses and physicians, amounting to $4500, and up to the present time has lost $6000 in wages. *Held*, that a verdict for $20,000, although large, is not so excessive as to call for interference by the appellate court.

10. **JUDGMENT: Reversed as to One Defendant: Affirmed as to Another: Interest.** There can be but one judgment rendered in the same cause. So that where plaintiff sued two defendants jointly for damages for personal injuries, and lost as to one of them, and appealed, and the judgment as to that defendant must be reversed, and obtained a verdict against the other defendant, which appeals, and the judgment as to it is affirmed, the judgment as to the latter defendant will be reversed and the cause remanded with directions to the trial court to hold the judgment in abeyance until final disposition is made of the case as to the other defendant, at which time it is to enter judgment against the appealing defendant for the amount of the verdict and six per cent interest to the date of its rendition, but said judgment is not to bear interest during the time it stands in abeyance.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

AFFIRMED.

*Boyle & Priest* and *T. M. Pierce* for appellant.

(1)   The court erred in refusing to grant the defendant a separate trial from its co-defendant, and further erred in refusing to allow defendant three peremptory challenges to the jurors upon the panel presented, from which the jury was selected which tried this case. R. S. 1899, secs. 694 and 3783; Hunt v. Railroad, 14 Mo. App. 160; Doyle v. Railroad, 103 Mo. App. 19.   (2) The court erred in refusing to instruct the jury at the conclusion of all the testimony that their verdict must be for defendant.   (a)   Because no negligence was shown on the part of defendant which caused any injury to plaintiff.   Huber v. Railroad, 66 N. W. 712; 4 Thompson on Negligence, sec. 3736; Walters v. Railroad, 64 App. Div. N. Y. 150; American Brewing Co. v. Talbot, 141 Mo. 683; Ray on Negligence of Imposed Duty, pp. 183-184; Fuch v. St. Louis, 167 Mo. 649; Ryan v. Railroad, 190 Mo. 621; Owings v. Oil Mill, 33 S. E. 511.   (b)   Because the plaintiff was guilty of contributory negligence.   Haertel v. Power Co., 69 Atl. 282; Danville Street Car Co. v. Watkins, 34 S. E. 884; Railroad v. Moseley, 57 Fed. 922; Wray v. Power Co., 68 Mo. App. 380.   (c)   Because the negligence of the defendant, if any, was but the remote and not the proximate cause of injury to the plaintiff.   Roddy v. Railroad, 104 Mo. 237; Keown v. Railroad, 141 Mo. 86; Beach on Contributory Negligence (2 Ed.), sec. 31; Wharton on Negligence, sec. 134; Shearman and Redfield on Negligence, sec. 26; Thompson v. Railroad, 140 Mo. 125; Stanley v. Railroad, 114 Mo. 606; Railroad v. Kellog, 94 U. S. 469. (3)   The court erred in giving instruction 4 at the request of the Union Iron & Foundry Company.   This instruction was erroneous because it rendered defendant

liable, unless it exercised more than ordinary care for the safety of plaintiff and thus conflicted with instruction 1 given for the plaintiff, and was further erroneous in that it permitted plaintff to recover against the defendant although the danger of the wires was obvious. Walker v. Railroad, 193 Mo. 483; Taylor v. Railroad, 137 Mo. 363; Epperson v. Postal Tel. Co., 155 Mo. 373. (4) The court erred in refusing to submit to the jury instructions 16 and 21 requested by the defendant. These instructions should have been given to the jury as requested, because if the defendant gave notice of danger to the foreman who had charge and direction of the men under him, it thereby excused itself from all injury to any of the workmen to whom notice of such warning would be imparted. Kiser v. Suppe, 133 Mo. App. 30; Story v. Railroad, 48 Atl. 288; Pittsfield Co. v. Shoe Co., 60 L. R. A. 116; Gagnon v. Dana, 41 L. R. A. 389; Towne v. Thompson, 46 L. R. A. 748; Bowe v. Hanking, 46 Am. Rep. 471; Jaffe v. Hortian, 15 Am. Rep. 438; Portsmouth Light Co. v. Honahan, 19 Atl. 1002. (5) The judgment is excessive. Reynolds v. Railroad, 189 Mo. 422; Devoy v. Railroad, 192 Mo. 197.

*Wm. McNamee* and *A. R. Taylor* for respondent.

(1) The first point made by appellant for a reversal is entirely without merit. Its contention is that appellant should have been granted a separate trial, citing Sec. 694, R. S. 1899, and Hunt v. Railroad, 14 Mo. App. 160. An inspection of the case cited shows that the court decided precisely against his contention. Section 3783, R. S. 1899, requires that, where there are several plaintiffs and defendants, each side must join in their challenges of the three jurors, exactly as the trial court required in this case. (2) Any person who maintains so dangerous and destructive an agent as electricity on his premises, where persons may lawfully be in and about their lawful business, must "use

every protection accessible to insulate its wires at all places where people have a right to go, and to use the utmost care to keep them so; and for personal injuries to a person in a place where he has a right to be without negligence on his part contributing thereto, it is liable in damages.'' Geismann v. Electric Co., 173 Mo. 674; Ryan v. Transit Co., 190 Mo. 633; Young v. Oil Co., 185 Mo. 664. (3) There need be no contractural relation with the maintainer of electricity in a place where persons may lawfully be; without protection or insulation, it is a duty to the whole public, including the injured person, to use the care defined by the decisions to protect their persons and lives against injury and death from such dangerous agency. Young v. Oil Co., 185 Mo. 662; Geismann v. Missouri Edison Co., supra; Ryan v. Transit Co., supra. (4) The plaintiff was guilty of no contributory negligence. The wires appeared to be perfectly insulated. The eye could not detect the difference between the covering on the wires and perfect insulation. This was the evidence of respondent and Armstrong both, and there was no evidence to the contrary. Geismann v. Missouri Edison Co., 173 Mo. 676; Clements v. Electric Light Co., 44 La. Ann. 692; Ryan v. Transit Co., 190 Mo. 635. Under these cases there is no evidence of contributory negligence by respondent in this case. Certainly not as a matter of law, and this issue was submitted to the jury in plaintiff's instruction 1, and the verdict established the fact that the respondent was not guilty of contributory negligence as a matter of fact. (5) The negligence of appellant in failing to insulate the wires was the direct cause of the injury. This negligence was present and active at the instant that respondent received the shock and was the proximate cause under the cases cited. Clements v. Electric Co., 44 La. Ann. 692; Geismann v. Missouri Edison Co., 173 Mo. 674; Ryan v. Transit Co., 190 Mo. 633;

234 Sup.—26

Byerby v. Light Co., 130 Mo. App. 601; Day v. Light and Power Co., 136 Mo. App. 279; Harrison v. Light Co., 195 Mo. 628; Joyce on Electric Law (2 Ed.), sec. 445. If the injury flows directly from the negligent act it is of no consequence that the particular result was unusual or unforeseen; the negligent author of the injury is liable. Hoepper v. Hotel Co., 142 Mo. 388; Harrison v. Light Co., 195 Mo. 629. Appellant's third contention is that the trial court gave, at the request of the defendant Union Iron and Foundry Company, instruction 4. The point is made that this instruction exacted of appellant more than ordinary care as to the dangers of his work on appellant's premises where the dangerous condition of appellant's electric current was. The first answer to this complaint is that the language of the instruction is not amenable to the charge made by appellant. It is silent as to what "degree of care" it was incumbent on the appellant to use. The second answer to this contention is that under the Geismann case, supra, and the Ryan Case, supra, Byerly v. Light and Power Co., 130 Mo. App. 601, and Day v. Light and Power Co., 136 Mo. App. 279, the instruction was entirely correct, for they impose on appellant the utmost care in maintaining its electricity safely. The third answer is that this instruction was given at the instance of one of the defendants and not of this respondent. The plaintiff cannot be affected by instructions asked or given between defendants. Taylor v. Railroad, 137 Mo. 368; O'Rouke v. Railroad, 142 Mo. 353; Beave v. Transit Co., 212 Mo. 355. Again, this instruction is immune from criticism, if interpreted as appellant does in his contention. Ordinary care is a relative term, it means such care as a person of ordinary prudence would use under the same or similar circumstances. That is, ordinary care used with reference to an act, depends upon the nature of the act. Ordinary care always requires the performance of legal duty.

In this case according to the decisions of this court cited and the general trend of decisions elsewhere, ordinary care requires that the maintainer of electricity on premises where persons may lawfully be, must use the utmost care to insulate. Geismann v. Missouri Edison Co., 173 Mo. 674; Beach on Contributory Negligence (3 Ed.), sec. 21. This instruction complained of was, therefore, entirely correct in its reference to the appellant as to the degree of care due from it to respondent, though it did not express any particular degree of care. (6) Instructions 16 and 21, were both incorrect in form and substance. That such a warning to the foreman, if given, and such a warning to this respondent, if given, was no warning at all, is held in the case of Clements v. Electric Light Co., 44 La. Ann. 696, cited with approval in Geismann Case, supra, at page 676. There was no warning that the apparently perfect insulation was, in fact, no insulation. The instruction 21, complained of, was vicious because it assumed that a warning of danger was given to Foreman Armstrong when there was a direct conflict of evidence as to the giving of any warning to Armstrong or any employee of the Union Iron and Foundry Company. It would have been reversible error to give an instruction assuming that such warning was given to Armstrong when all the evidence given for the plaintiff and the evidence of Armstrong himself contradicted such fact of warning. Railroad v. Stewart, 201 Mo. 498; Crow v. Railroad, 212 Mo. 610. The appellant owed the duty of keeping its wires safely and securely insulated. This duty it owed to every person who might lawfully come in proximity to the wires, whether under a contractural or other relation. The simple fact that human beings might lawfully come in contact with the uninsulated wires charged upon the appellant the duty of using every means accessible to insulate the wires and safeguard from injury such persons as would lawfully be in proximity to and in danger from

the wires. This is the settled law of this State. Geismann Case, 173 Mo. 674; Young v. Oil Co., 185 Mo. 665; Ryan v. Transit Co., 190 Mo. 634. (7) The damages were not excessive.

WOODSON, J.—The plaintiff brought this suit in the circuit court of the city of St. Louis against the defendants, to recover $30,000 damages for personal injuries sustained by him on January 17, 1905, through the alleged negligence of the defendants. A trial was had before the court and a jury, which resulted in a verdict and judgment for the plaintiff against the defendant Railway Company for the sum of $20,000, and in a verdict and judgment in favor of the defendant Iron & Foundry Company. From the former judgment, the Railway Company duly appealed to this court; and from the latter, the plaintiff duly prosecuted its appeal, which will be considered in a separate opinion.

The facts of the case are practically undisputed, but whatever disputes there are will be duly noted in the course of the opinion.

The plaintiff was a structural iron worker, employed by the defendant Iron & Foundry Company, a corporation, engaged in the construction of an iron coal chute for and on the premises of defendant Railway Company, a corporation, engaged in the street railway business in the city of St. Louis.

This coal chute was being constructed between the power house of the defendant Railway Company and the tracks of the Wabash Railway Company on the west. On the date of the injury the defendant Railway Company was maintaining poles for carrying large wires, called feed wires, heavily charged with electricity, leading from its power house to various stations along its lines of road for the purpose of furnishing motive power for its street cars. These wires passed from the power house, resting upon the cross-

arms of the carrying poles, about twenty-five feet above the surface of the earth, and passed within fifteen or twenty feet of the coal chute so being constructed.

James Stewart & Son were the general contractors with the defendant Railway Company for the work and had exclusive charge and control of the same, and the defendant Iron & Foundry Company was the sub-contractor to do the iron work on the structure; and respondent Clark, as before stated, was an employee of the latter company. At the time of respondent's injury he was assisting in the erection of said coal chute, subject to and in obedience to the orders of his foreman, Samuel Armstrong. He was standing on the cross-arms of one of these poles, engaged within the line of his duty of passing a guy rope, made of rope and steel blocks, over the wires on said pole, for the purpose of securing a gin pole used by the Iron & Foundry Company in hoisting materials to be used in the construction of said chute. This guy rope was quite heavy, weighing about seventy-five or a hundred pounds.

The respondent's evidence tended to show that the usual and practical and safe mode of getting the rope over the wires was to have a man ascend the pole and stand on the cross-arm and one wire and let down a hand line to the ground, and then have the guy rope attached by its end to the hand line so lowered, and then for the man on the pole to raise the end of the guy rope up by pulling the hand line, and when up take the rope in his hands and pass it over the wires.

The appellant's evidence tended to show that the best, safest and most practical way to pass the guy rope over was for the man to stand on the ground and throw the hand line over the wires, attach it to the end of the guy rope and then pull on the hand line until the guy rope passed over the wires.

The guy rope was about seventy-five feet long, with one end fastened to the top of the gin pole, and the other to a post or iron beam firmly set in the ground some distance from the gin pole, and made taut so as to prevent the gin pole, which was forty-seven feet high, from moving in the opposite direction. There were other guy ropes securing the gin pole from moving in other directions.

It was necessary in constructing the coal chute to adjust the guy rope, and in doing so it was necessary to have it placed above the wires and be attached to a post or beam near the Wabash Railroad tracks.

The feed wires in question were carrying about six thousand volts of electricity, and were insulated with what is called "weather proof insulation," which was intended simply to protect the wires from being injured by the weather, but such covering afforded but little, if any, obstruction to the electric current or fluid escaping from the wires the instant a conducting medium should occur between two or more of the wires. The system of wires here in use was what is known as the "three-phase system," which system does not have a grounding, that is, there was no connection of the current with the earth.

The danger of injury with this system consists in what is called a "short circuit," that is, a medium or conductor touching or connecting two or more of the wires. In such a system the body of a person forming a part of the medium or conductor would form a part of a short circuit, and the current of electricity on the wires would pass through his body instead of following the wires around the long circuit. Ordinarily two thousand to twenty-five hundred volts of electricity will destroy human life.

The wires, as stated, were covered with a material that, to the eye, appeared to be complete insulation; though, in fact, said covering did not consist of insulation material, and did not prevent the electric current

from escaping from the wires.

The wires were in that condition when Armstrong, the foreman, ordered the respondent and one Gableman to go up the pole and get the guy rope over the wires. Gableman placed a ladder, about fifteen feet long, against the pole, and the respondent got the hand line and took it up the ladder and on to the top of the pole with him. After getting to the top of the pole and standing on the cross-arm and on one of the wires, which, according to respondent's evidence, appeared to be safely insulated, he lowered the line to Gableman to attach to the guy rope by the end thereof, which was done. Respondent then proceeded to raise the guy rope with care, and, according to his evidence, without any apprehension that the insulation on the wires was insecure. His evidence also tended to show that he was careful to prevent the guy rope from touching the wire or touch it with any force that might disturb the insulation. As he drew the guy rope up, and as the block got near the wire, he reached down to prevent any contact between the block and wire, and the block touched the insulation wire, and his feet being on the other wire, his body and the block completed the short circuit, and the electric current passed through his body. He, for an instant, realized the shock and his peril, and threw himself backward, falling on the wires and received the injuries of which he complains.

Respondent's evidence also tended to show that the Railway Company knew the wires in question were uninsulated and dangerous to any one working among or about them; and that said Railway Company did not notify him or his foreman, Armstrong, that the said wires were uninsulated or dangerous.

The appellant Railway Company introduced evidence tending to prove that it notified Armstrong, the Iron & Foundry Company's foreman, that the wires in question were feed wires, carrying a heavy voltage

of electricity, and that it would be dangerous for him and men to work near or go about them.

Such additional evidence as may be necessary for a proper disposition of the case will be noticed in the proper connection in the opinion.

On behalf of the plaintiff, and over the objections and exceptions of defendant Railway Company, the court instructed the jury as follows:

"1. If the jury find from the evidence in this case that on the 17th day of January, 1905, the plaintiff was in the service of defendant Union Iron & Foundry Company, as a laborer at the work of erecting a coal structure, mentioned in the evidence;

"And if the jury find from the evidence in this case that on said day defendant, Union Iron & Foundry Company, was engaged as a sub-contractor .in erecting said coal structure upon the premises of the defendant St. Louis & Suburban Railway Company, mentioned in the evidence, under a contract with the contractor of the said St. Louis & Suburban Railway Company, and with the knowledge and consent of said St. Louis & Suburban Railway Company;

"And if the jury find from the evidence that on said day defendant, St. Louis & Suburban Railway Company, was maintaining ·upon said premises the poles and feed wires mentioned in the· evidence;

"And if the jury find from the evidence that said wires were charged with electricity. at said time;

"And if the jury find from the evidence that said wires as so maintained upon said poles and charged with electricity were dangerous to human life and limb if electricity should pass from said wires through the body of a human being;

"And if the jury find from the evidence that said wires were insufficiently guarded or insulated to prevent the electric current from passing from said wires in case a conductor of electricity should come into contact with said wires;

"And if the jury find from the evidence that said wires on said poles were so situated that persons and this plaintiff would be near them and in contact with them and bring objects with which he worked into contact with said wires whilst at and about the work of his employment;

"And if the jury find from the evidence that defendant St. Louis & Suburban Railway Company, by its agents in charge of said premises, knew, or by the exercise of ordinary care would have known, that persons and this plaintiff whilst at and about the work of his said employment would be at and about said wires and in danger of being shocked and injured thereby, and failed to warn him of said danger or to guard or sufficiently insulate said wires to prevent said electricity from escaping from said wires;

"And if the jury find from the evidence that said St. Louis & Suburban Railway Company did not exercise ordinary care in so failing to guard or sufficiently insulate said wire, or warn plaintiff of said danger;

"And if the jury find from the evidence that on said day the plaintiff was on said pole engaged in the duty of his said employment in raising a guy rope and block over said feed wires, and that whilst so engaged the block of said guy rope came into contact with one of said feed wires and thereby the electric current passed from said wire into the body of the plaintiff and shocked him and caused him to sustain the injuries mentioned in the evidence;

"And if the jury further find from the evidence that the plaintiff at the time of his injuries was exercising ordinary care, then he is entitled to recover against the St. Louis & Suburban Railway Company;

"And if the jury further find from the evidence that on said day the plaintiff was in the service of defendant Union Iron & Foundry Company, as a laborer, and that one Samuel Armstrong was at said

time the foreman of defendant, Union Iron & Foundry Company, authorized by said Union Iron & Foundry Company to command and control the plaintiff in the work he was to do and the manner of doing the same;

"And if the jury find from the evidence that on said day, said foreman ordered the plaintiff to go up the pole mentioned in the evidence over the feed wires mentioned in the evidence;

"And if the jury find from the evidence that on said day the plaintiff in obedience to said order of the said foreman was on said pole engaged in the work of raising said guy rope and block up to pass it over said feed wires, and that whilst doing so said guy rope and block came into contact with one of said feed wires so insufficiently guarded or insulated and that thereby the plaintiff was shocked as aforesaid, and caused to sustain the injuries mentioned in the evidence;

"And if the jury further find from the evidence that said foreman knew or in the exercise of ordinary care would have known, of said danger and ordered the plaintiff to do said work;

"And if the jury find from the evidence that said foreman did not exercise ordinary care in so ordering the plaintiff to do said work without such warning, and that such failure to exercise ordinary care directly contributed to cause plaintiff's said injuries and directly concurred with said failure to exercise ordinary care on the part of the defendant St. Louis & Suburban Railway Company, in causing plaintiff's said injuries, and if the jury find from the evidence that the plaintiff was exercising ordinary care at the time of his injuries, then the plaintiff is entitled to recover against both defendants."

"2. If the jury find for the plaintiff, they should assess his damages at such a sum as the jury believes from the evidence will be a fair pecuniary compensa-

tion to him: First, for any pain of body or mind which the jury believe from the evidence he has suffered, or will with reasonable certainty suffer by reason of his injuries and directly caused thereby, if any; second, for any expenses necessarily incurred for medicines, medical or surgical attention, which he has incurred or with reasonable certainty will incur, by reason of his injuries caused thereby, if any.''

At the request of the Union Iron & Foundry Company, the court, over the objection and exceptions of the Railway Company, instructed the jury as follows:

"4. The court instructs the jury that a different rule of law applies as between the plaintiff and his employer, and as between him and the Railway Company, touching the risks assumed by and the degree of care to be exercised towards the plaintiff, in respect to the charges of negligence made by the plaintiff against these defendants respectively, and you are instructed that as between the plaintiff and the defendant the Union Iron & Foundry Company, the plaintiff assumed the risks of injury from contact with the wires in question so far as such risks were obvious, or as discernable to him as they were to the defendant the Union Iron & Foundry Company, and its foreman Armstrong, by the exercise of ordinary care, to the extent that their respective opportunities for inspection of such wires and knowledge of such risks were equal.''

The defendant railway company requested the court to give the following instructions, among others, which were by the court refused, to which action of the court in refusing them counsel for said defendant duly excepted.

"16. The court instructs the jury that if they believe from the evidence in this case that the St. Louis & Suburban Railway Company, through its agents, warned the foreman of the Union Iron & Foundry Company, mentioned in plaintiff's evidence, not to

go near the feed wires, described in plaintiff's evidence, then, in that case, the St. Louis & Suburban Railway Company is not liable jointly with the Union Iron & Foundry Company, or at all, for the injury, if any, done to plaintiff resulting from his proximity, if so he was, to the feed wires described in plaintiff's evidence, and the jury will find for defendant.''

"21. The court instructs the jury that a warning to the foreman Armstrong, under whom plaintiff was working at the time of his injury, of the danger of coming in close proximity of the wires described in the evidence, was in law a warning to the plaintiff, and the plaintiff was chargeable with notice of such warning, whether it was in fact communicated to him or not by the said Armstrong.''

We have set out only such instructions which were given and refused as are complained of by counsel in this court.

We take it for granted that all objections not here presented by counsel are waived or abandoned.

I.   Counsel for the appellant have presented two preliminary questions of practice, which will be taken up and disposed of before we consider the merits of the case.

When the cause was called for trial, and the parties announced ready, the appellant filed the following motion, requesting the court to grant it a separate trial, to-wit:

"Comes now the St. Louis & Suburban Railway Company, and moves this Honorable Court to grant it, as one of the defendants herein, a separate trial of the issues in this case involved, for the following reasons, to-wit:

"First. Because the defendants in this case were sued jointly.

"Second. Because there is no joint act of defend-

ants in this case set up, complained of or described in the petition herein.

"Third. Because the grounds of alleged liability against the St. Louis & Suburban Railway Company are distinct and different from the grounds of alleged liability of the Union Iron & Foundry Company, one of the defendants herein.

"Fourth. Because there is nothing in common between the two defendants in this case, and the St. Louis & Suburban Railway Company should not be required to be a mere spectator of the trial of issues between the plaintiff and the Union Iron & Foundry Company, in which issues the St. Louis & Suburban Railway Company has no interest.

"Wherefore, this defendant prays the court to make an order granting a severance from its co-defendant, the Union Iron & Foundry Company, and a separate trial of the issues herein involved."

This motion was overruled, and exceptions saved.

Counsel for appellant predicates its right to a separate trial upon section 694, Revised Statutes 1899, which in so far as material to this question reads: "When there are several causes of action united in a petition, or where there are several issues, and the court shall be of the opinion that all or any of them should be tried separately by the court or jury, it may, on the application of either party, direct separate trials, which may be had at the same or at different terms of the court, as circumstances may require."

The case of Hunt v. Railroad, 14 Mo. App. 160, is cited and relied upon by counsel for appellant as construing that statute and sustaining their claim of right to a separate trial. In that case one Higgins, the contractor, and the Railway Company were jointly sued. The facts of that case, as stated by the court, were as follows: "The testimony tended to show that defendant Higgins was a contractor for reconstructing the 'Dorris Row' of buildings, on the north side of

Olive street in the city of St. Louis. He used in his work a movable derrick, about thirty-eight feet in height, which was placed on the sidewalk and leaned toward the building, from five to seven feet from the perpendicular. It was secured in position by two guy ropes, about eighty-seven feet apart at the lower ends, which extended from the top of the derrick to the other side of the street, and were there tied to upright posts, at the height of six or eight feet from the ground. These guys were, in fact, one continuous rope, passing through pulleys at the top of the derrick. There was also a rope which held the top of the derrick towards the building. This was tied to an upright piece of scantling, within an upper story, which was nailed at the top and bottom to the joist and the floor, and was otherwise reinforced by secured bits of scantling. Some ten or fifteen minutes before the accident hereinafter mentioned, the derrick was moved about two feet westward, and the west guy rope which, until then, had been fastened at a point forty feet from the other, was moved and tied to a post forty-seven feet further west. There was a good deal of testimony tending to show that the workmen, in making these adjustments, used much care in providing against a possible contact of the ropes with passing street cars. The plaintiff's husband, a passenger, was standing upon the rear platform of car No. 93 of the defendant railroad company, going east. It appears that the west guy rope was caught by a corner of the ventilator, or cupola, on top of the car, with the effect of pulling the derrick over, so that it tore away the scantling to which the inner stay rope was fastened, and, falling upon the rear platform of the passing car, killed the plaintiff's husband. There was testimony tending to show that a few minutes before the accident, and after the new adjustment of the derrick and ropes, a car, whose height exceeded that of No. 93, had passed along in the same direction, without any mishap, and that

this occurrence was in view of the driver of No. 93. The derrick had been in use at that place for several months before, and was similarly used for a long time after the catastrophe, without any interference with the passing cars."

There, as here, the defendant Railway Company formally demanded a separate trial, which was by the court refused. The Court of Appeals in passing upon that question, after quoting the statute of 1879, which is the same as that of 1899, before quoted, held that the power therein granted to the trial court to grant separate trials as therein provided was a discretionary power, and that an exercise of that discretion in refusing to separate trials of joint defendants in civil actions were not reviewable on appeal without it clearly appeared that the discretion had been abused. That court also held that the trial court did not abuse its discretion in that case in refusing the defendants separate trials. Clearly there is nothing in that case lending support to the contention of counsel. In fact, its holding is clearly to the contrary, except in those cases where the complaining party clearly shows that the trial court abused its discretion, which has not been attempted in this case. We are of the opinion that the Court of Appeals correctly construed the statute there under consideration, and properly refused the defendants separate trials. If we apply that ruling to the facts of this case, which in our opinion should be done, then we must and do hold that the trial court in the case at bar did not err in overruling appellant's motion requesting a separate trial.

II. The second question of practice presented by counsel for appellant challenges the correctness of the ruling of the trial court in refusing the railway's claim of right to a peremptory challenge of three jurors.

The Railway Company, before the trial com-

menced, demanded of the court that a panel of twenty-one jurors be presented, so that each of the defendants might be allowed three peremptory challenges. This request was denied by the court, and appellant duly excepted.

In support of this contention counsel for appellant cite section 3783, Revised Statutes 1899, and the case of Doyle v. Transit Co., 103 Mo. App. 19.

Said section reads: "In trials of civil causes each party shall be entitled to challenge, peremptorily, three jurors; but when there are several plaintiffs and defendants they shall join in their challenges, and the plaintiff shall, in all cases, announce his challenges first." This section of the statute, instead of authorizing each of the defendants to make three challenges, expressly provides that where there are two or more plaintiffs or defendants they shall join in their challenges. That is, the plaintiffs or defendants in such cases have jointly the right to make three challenges, and not that each has the right to three.

This identical question was also presented to the St. Louis Court of Appeals in the case of Hunt v. Railroad, supra, and the court there expressly ruled against the appellant's contention, and we think properly so. The case of Doyle v. Transit Co., before mentioned, is not in point. The question here presented was neither made nor discussed by court or counsel in that case.

In our opinion this contention of counsel for appellant is untenable, and we, therefore, hold against them in that regard.

III. This brings us to the consideration of the merits of the case; and the first insistence presented by counsel for appellant under this branch of the case is, that the trial court erred in refusing to give the demurrer to the evidence, asked on behalf of appellant. There are three reasons presented why the demurrer should have been sustained:

First.   Because the evidence failed to show that appellant was guilty of any negligence which caused the injury.

Second.   Because the respondent was guilty of contributory negligence.

Third.   Because the negligence of the appellant, if any, was but the remote and not the proximate cause of the injury to the plaintiff.

We will discuss the first and third reasons presented together.

Under this arrangement, the question is, was the appellant guilty of any negligence, and, if so, was it the proximate or the remote cause of plaintiff's injury?

The evidence is undisputed, that the appellant owned the premises on which the coal chute was being erected, and that in close proximity thereto it maintained on poles high-tension wires, carrying a voltage of about six thousand volts of electricity, which was highly dangerous to life and limb, should it pass through the body.  By contracting with Stewart & Son, the contractors, to erect the coal chute upon its premises and for its use, the appellant by necessary implication agreed with the contractors and the sub-contractors, that they and all necessary laborers whom they should employ might be taken by them to the premises and there assist in the construction of the coal chute.  The evidence also was uncontradicted that the respondent was rightfully upon the premises as an employee of the Union Iron & Foundry Company, subcontractor, engaged in the work of erecting the said coal chute for the appellant.  While so engaged in the performance of his duties respondent came in contact with two or more of appellant's high-tension wires, and received the shocks of which he now complains. According to all of the adjudications of this court regarding this class of injuries, the foregoing evidence

234 Sup.—27

made out a prima facie case for the respondent, especially when it was conceded by all that the wires in question were not insulated at all, but were simply covered with some weather-proof substance, intended to protect the wires from the elements, and not for the purpose of preventing the electric current from escaping therefrom.

The last utterance of this court upon this subject is found in the case of Von Trebra v. Gaslight Co., 209 Mo. 648. On pages 658 to 660 this court reviewed the earlier cases, and in doing so used the following language:

"1. Appellant's first assignment of error is lodged against the action of the trial court in refusing to give its instruction in the nature of a demurrer to the evidence.

"It is elementary in this State that a demurrer admits every fact to be true which the evidence in the cause tends to prove, whether by direct testimony or by reasonable deductions to be drawn therefrom. According to this rule, the court properly refused that instruction, for the reason that there was evidence in the case which tended to prove that Von Trebra came in contact with the wires of defendant, and that when he did so a flash of light was seen at the point of contact, and that he was, at the same instant, seen to fall head-foremost from the pole to the ground, in an unconscious condition, thereby receiving severe injuries, and that he died therefrom shortly thereafter. This evidence made out a prima-facie case on the part of the plaintiff, which entitled her to have the issues of fact submitted to the jury.

"The settled law of this State regarding this class of injuries is, that it is not necessary for the plaintiff to prove, in order to recover, that the insulation was off of the wire, at the point of contact. All the law requires is that it be shown that the defective insulation caused the injury, without fault on his part, and

that he was rightfully where he was. It is equally well-settled law of this State, that when injury or death is caused by coming in contact with such a wire, it is conclusively presumed that the insulation of the wire was defective. This rule was stated in the case of Geismann v. Missouri-Edison Electric Co., 173 Mo. l. c. 678, by BURGESS, J., in the following language: 'It follows from these authorities that it was defendant's duty, in the first place, to use every protection which was reasonably accessible to insulate its wires at the point of contact or injury in this case, and to use the utmost care to keep them so, and the mere fact of the death of Geismann is conclusive proof of the defect of the insulation and negligence of the defendant, and as to whether he was guilty of contributory negligence or not was a question for the jury.' The opinion in that case, after a most careful and exhaustive consideration of the legal propositions involved therein, and in which all of the authorities of this country bearing upon the questions were carefully reviewed, enunciated the law as above stated.

"The case of Ryan v. Railroad, 190 Mo. 621, announces the same rule, and it is an equally well-considered case, in which GANTT, J., cited the Geismann Case, and, approvingly, quoted extensively therefrom. The same rule thus announced was followed in the case of Young v. Waters-Pierce Oil Co., 185 Mo. 634.

"We are, therefore, of the opinion that the court committed no error in refusing to give defendant's instruction in the nature of a demurrer to the evidence."

This court also said in the case of Geismann v. Missouri-Edison Electric Co., 173 Mo. l. c. 674: "The deceased was, at the time he received the shock which caused his death, in a place where his duty required him to be, and it was the duty of the defendant in the exercise of even ordinary care and foresight to know that sign-hangers, painters, carpenters and other mechanics would be required, as occasion might require

of them in the pursuit of their respective occupations, to come in proximity to its wires constructed and maintained on the signs and cornice in front of the building where the accident occurred. As was said in Overall v. Louisville Electric Light Company, 47 S. W. 442; 'Appellant at the time he was struck was in a place where his business required him to be, and where he had a right to be, and it was the duty of the electric light company to know that linemen of the telephone company would have to come into close proximity to its wires in attending to their duties, and it was its duty to use every protection which was accessible to insulate its wires at that point, and at all points where people have a right to go for business or pleasure, and to use the utmost care to keep them so, and for personal injuries resulting from its failure in that regard it is liable in damages.' ''

And the mere fact that there was no contract relation existing between respondent and the appellant does not change the principle of law just stated. In considering this phase of the question, this court in the case of Ryan v. St. Louis Transit Co., 190 Mo. l. c. 633, said: "It is to be noted that there were no contractural relations between the deceased husband of the plaintiff, and the defendant Transit Company, but it is undisputed that the deceased was upon the premises of the company with its knowledge and consent, and to do a work for which the company had contracted with the employer of the deceased. When the defendant company made its contract with Cullen & Stock Heating and Ventilating Company to install the oil system in the defendant's power house upon plans and specifications prescribed by itself, it knew and was bound to anticipate the necessity under which the Heating and Ventilating Company rested of sending its employees upon its premises for the purpose of installing the pipes upon which the deceased was working when he was killed, and hence the duty devolved upon

the defendant of keeping the electrical wires, near which the deceased was required to work in the performance of his duty in installing the oil pipes, so insulated and protected as to be safe for the deceased to work in their vicinity.''

By reading the cases above referred to it will be seen that they cover the entire field and leave nothing further to be said upon the subject in hand.

We are, therefore, of the opinion that the trial court did not err in refusing to sustain the demurrer upon the first and third grounds assigned.

As to the second reason urged as to why the demurrer should have been sustained, it is sufficient to say that contributory negligence is a matter of defense, which must be pleaded in the answer and established by the defendant to the reasonable satisfaction of the jury by the preponderance of the evidence. There was much evidence introduced which tended to show that respondent was exercising due care while passing the guy rope over the wires in question, and there was also much evidence which tended to show that his conduct in that regard was negligence, and that in consequence thereof he was injured. This presented a question of fact, which was under proper instructions submitted to the jury, and it found against the appellant, and that finding is binding upon this court.

In discussing this question, this court in the Von Trebra Case, supra, at page 662, said: ''It is finally contended that the plaintiff was not entitled to recover for the reason that her husband was guilty of negligence which contributed directly to his injury and death. If that contention is true in point of fact, then, unquestionably she should not be permitted to recover, and the judgment should be reversed. Contributory negligence is a defense which must not only be pleaded, but the burden of proving such negligence rests upon the defendant. While it is true there is evidence in this record which might have warranted the jury in

finding he was guilty of contributory negligence, yet they did not do so. That was an issue which could be only determined by the jury. It was properly submitted to them, and they found against appellant, which is conclusive upon this court."

We are, therefore, of the opinion that the trial court committed no error in refusing appellant's instruction in the nature of a demurrer to the evidence.

IV. The next error assigned by counsel for appellant challenges the correctness of instruction numbered 4 given by the court on behalf of the defendant Iron & Foundry Company.

That instruction has been copied in the statement of the case, and need not be reproduced here. It, in substance, told the jury that a different rule applies as between the respondent and his employer and as between him and the appellant touching the risks assumed by and the degree of care to be exercised toward the respondent in respect to the charges of negligence made by the respondent against the defendants, respectively; and that as between the respondent and the Iron & Foundry Company, he assumed the risks of injury for contact with the wires in question as far as such risks were obvious or discernible to him as they were to the defendant Iron & Foundry Company and its foreman, Armstrong, by the exercise of ordinary care to the extent that their respective opportunities for inspection of such wires and knowledge of such risks were equal.

Counsel insists that this instruction was erroneous, because it rendered the appellant liable unless it exercised more than ordinary care for the safety of respondent, and thus conflicts with instruction number 1, given for respondent; and was further erroneous in that it permitted the respondent to recover against the appellant although the danger of the wires was obvious.

After a careful reading of that instruction, we are

satisfied that the language thereof does not bear the construction placed upon it by counsel for appellant. It nowhere tells the jury what degree of care the appellant owed the respondent.

But independent of that, suppose the instruction was amenable to that criticism, still it would have no right to complain, for the reason that had it told the jury in so many terms that appellant was required to use more than ordinary care for the safety of respondent, it would have correctly declared the law of the case, for the reason that all of the decisions in this State, and in many others, imposed upon the appellant the utmost care in maintaining its electricity in safety. [Geismann v. Missouri-Edison Electric Co., 173 Mo. 654; Ryan v. Railroad, 190 Mo. 621; Young v. Waters-Pierce Oil Co., 185 Mo. 635; Von Trebra v. Gaslight Co., supra.]

In discussing this question in the Geismann Case, this court in speaking through Judge BURGESS used this language: "Electricity is one of the most dangerous agencies every discovered by human science, and owing to that fact it was the duty of the electric light company to use every protection which was accessible to insulate its wires at all points where people have the right to go, and to use the utmost care to keep them so; and for personal injuries to a person in a place where he has a right to be without negligence upon his part contributing directly thereto, it is liable in damages. [McLaughlin v. Louisville Electric Light Co., 100 Ky. 173.]"

The other cases cited state the law to be as announced in the Geismann Case. We are, therefore, of the opinion that the instruction in question is not vulnerable to the first objection urged against it.

As to the second objection made thereto, it is sufficient to say that there is no language to be found therein which can be tortured into telling the jury that respondent could recover from the Railway Company

notwithstanding the danger of the wires was obvious to the respondent. That question was fairly and properly submitted to the jury by other instructions which were given by the court, and to which no objection is here made.

The third answer to appellant's assault upon said instruction number 4 is, that it was not given at the request of the respondent, but at the instance of the defendant Iron & Foundry Company. The law in this State is well settled that the respondent cannot be affected by instructions asked or given between defendants. [Taylor v. Railroad, 137 Mo. l. c. 368; O'Rourke v. Railroad, 142 Mo. l. c. 353; Beave v. Transit Co., 212 Mo. l. c. 355.]

This question has been so long and firmly settled in this State that further discussion of it would be more than useless.

We are, therefore, of the opinion that instruction numbered 4 was not reversible error, even though it be conceded that it was erroneous as between the defendants, which, however, is not the case.

V. The fifth contention of appellant is, that the court erred in refusing to give the jury instruction number 16 asked by it.

This instruction is copied in the statement of the case, and in effect it told the jury that if they found that the appellant warned the foreman of the Union Iron & Foundry Company not to go near the feed wires, then it was not jointly liable with the latter company, or at all, for the injuries sustained by the respondent.

We are not certain that we clearly understand the theory of the law upon which counsel for appellant asks this instruction. But as we gather from their oral and printed argument, their theory is this. That having let the contract to build the coal chute to Stewart & Son, independent contractors, over which appellant

had no control, the doctrine of *respondeat superior* does not apply as between it and the respondent any more than it would between it and the Union Iron & Foundry Company, the sub-contractor, whose employee respondent was, after having notified it of the danger of working about the pole and wires.

From the foregoing premises it is argued that Stewart & Son, being independent contractors, had the exclusive possession of the coal chute and the ground upon which it was being erected, and over whom the appellant had no control while they were performing the work. That Stewart & Son bore a similar relation to appellant that a tenant bears to his landlord; and, consequently, it was not liable to the Union Iron & Foundry Company (which carrying the analogy out) would be the sub-tenant of Stewart & Son, or to any of the latter's employees, or any of its invited guests to the premises. Or re-wording appellant's position, it is this: A contractor's servant should not be permitted to maintain an action against the owner of the premises merely because he is such servant, unless the contractor could have maintained the action if he had been injured instead of the servant.

The following cases are cited in support of this contention of counsel for appellant, to-wit: Kiser v. Suppe, 133 Mo. App. 30; Story v. Railroad, 48 Atl. 288; Pittsfield, etc., v. Shoe Co., 60 L. R. A. 116; Gugnon v. Dana, 41 L. R. A. 389; Towne v. Thompson, 46 L. R. A. 748; Bowe v. Hunking, 46 Am. Rep. 471; Jaffe v. Hartean, 15 Am. Rep. 438; Portsmouth Gaslight Co. v. Shanahan, 19 Atl. 1002.

Without stopping to analyze those cases, suppose it be conceded that they support that contention of counsel, and that they correctly announce the law applicable to the facts of each, still we are unable to see what application any of them have to the case at bar. In the cases cited the independent contractor and his employees not only had exclusive possession of the

premises upon which the work was being done, but also had the control and management of the instrumentalities or dangers which caused the injuries sued for; while here it is not even contended that Stewart & Son, the independent contractors, the Union Iron & Foundry Company or any of its employees were ever in the possession of the pole and wires in question. Those poles and wires were indispensable instrumentalities in the operation of appellant's street car system—they were not on the premises upon which the coal chute was being erected, but were removed about fifteen or twenty feet therefrom. Stewart & Son, or their sub-contractor, the Union Iron & Foundry Company, or its employees had no right or authority to insulate appellant's wires, or otherwise interfere with or abate the great danger which was incident to their maintenance. In fact, this record abounds with evidence introduced by appellant which tended to show that the contractor, sub-contractor and probably some of the latter's employees were repeatedly warned by the agents of appellant not only of the dangerous character of the wires, but were also notified and warned not to anchor their guy ropes to the poles in question, or to permit them to come in contact with the wires strung thereon, fearing that if they did either the pole might be broken down, or the wires mentioned might thereby be broken or brought together and burned out or otherwise damaged, either of which would do great injury to appellant's property and suspend for a time, at least, its entire business as a common carrier.

This whole record is entirely inconsistent with the idea that the contractor, sub-contractor or any of their employees had possession of or any control whatever over the pole and wires in question; but, upon the contrary, the whole burden of appellant's song was that it had the possession and control of the pole and wires, and was doing everything within its power to keep

the people who were erecting the chute off of them, and from molesting them in any manner. That being unquestionably true, and as the respondent at the time he received the shock of which he complains was at a place where his duty required him to be, it was the duty of the appellant to exercise the utmost care and foresight to know that the iron structural workers and other employees of the Union Iron & Foundry Company would be required, as occasion might require of them in the pursuit of their respective occupations, to come in close proximity to its wires, constructed and maintained along and near the end of the chute which they were erecting. And as was said by this court in the case of Geismann, supra, on page 674, respondent "at the time he was struck was in a place where his business required him to be, and where he had a right to be, and it was the duty of the electric light company to know that linemen of the telephone company would have to come into close proximity to its wires in attending to their duties, and it was its duty to use every protection which was accessible to insulate its wires at that point, and at all points where people have a right to go for business or pleasure, and to use the utmost care to keep them so, and for personal injuries resulting from its failure in that regard it is liable in damages."

According to the law as thus announced by this court, there is no escape from the conclusion that the appellant is liable to the respondent in this case, and that being true, it logically follows that the court did not err in refusing instruction number 16 asked by appellant.

The same result would follow if we should treat the relation that existed between the appellant and the contractor and sub-contractor as the same as that which exists between a landlord and tenant. Suppose the landlord should lease a house and lot to a tenant and notify him of a hidden pitfall situate on one cor-

ner of the lot, and should retain exclusive possession of and control over the pitfall with directions to the tenant not to touch or molest it in any manner (as appellant did of the pole and wires in the case at bar); and suppose an invited guest of the tenant in walking across the lot should accidentally step or fall into the pit, would it be seriously contended that the landlord would not be liable in damages to the guest for all injuries sustained by reason of having fallen into the pit? I apprehend not.

VI. The next insistence is that the trial court erred in refusing to give instruction numbered 21, requested by appellant.

This instruction is also copied in the statement of the case; and much of what has been said of instruction numbered 16 is equally applicable to this one. But independent of that, this instruction is bad in both form and substance. It neither states the law correctly, nor predicates it upon any fact or facts, or upon the evidence in the case. It simply attempts to state an abstract principle of law without predicating it on any evidence whatever. We, therefore, hold that the court correctly refused to give this instruction.

VII. It is finally insisted by counsel for appellant that the verdict is excessive, and should be set aside or reduced for that reason.

The verdict was for $20,000, and for that reason should be closely scrutinized. The evidence as to the character and extent of respondents injuries is uncontradicted; and since the jury has passed upon it, we must take it to be true.

We will let the respondent and Dr. Spooner, his physician, describe the injuries in their own language.

The following are the questions propounded to respondent and his answers made thereto:

"Q. How long were you at the Mayfield sanita-

Clark v. Railroad.

rium? A. Eight weeks. Q. Do you know who carried you there? A. No, sir. Q. You were there eight weeks? A. Yes, sir. Q. Where were you taken to from there? A. Taken home under the influence of chloroform. Q. Who treated you for these injuries at the Mayfield sanitarium? A. Dr. G. H. Spooner. Q. How long did Doctor Spooner treat you for these injuries? A. Well, something like a year. Q. Now, what were the injuries—describe them as well as you can to the jury, and exhibit the injuries to the jury. A. Well, the tendons were all burned out of my right arm; my fingers are on there, but they are useless. Q. Show them to the jury. Step down to the jury and show your hands. A. The tendons (witness showing hands to jury) and everything is all burned out of the right hand; it is perfectly useless, no feeling in it; and in the left hand the tendons are all burned out so the fingers are useless. I have just a little use of that thumb (indicating.) This leg (indicating) is all burned out. There is a large place right there (indicating), it is two inches square, with no flesh or anything on it. There is a little piece of bone sticking out and no skin. The top of this foot (indicating) is burned off. There is another big hole up here (indicating). You can see that there (indicating). There is a place (indicating) burned clear to the joint, you can see the elbow joint in there, and another place under this arm (indicating) there is a large hole burned down there. Q. Can you show your leg to the jury? A. I can if somebody will help me. (Dr. Spooner assists witness in arranging his clothes.) Now, you can see what that is. (Showing foot to the jury.) Q. Describe it as well as you can? A. The tendons here (indicating) are all burned out. In here (indicating) you see there is nothing, no tendons or muscles or hardly anything there that is left. The leg is stiff. The knee joint is as stiff as any other part of the bone. You can see the parts have been burned all around there (indicating).

The arteries that should go through there (indicating) are running inside here over the top of the leg. There is another place down there (indicating). That place there (indicating) here is where the electricity burned clear to the bone. That (indicating) was burned so you could see the bone right there and the leg is in a position so I have to be awful careful in walking, I have a stiff leg. If I hit anything at all now it pretty near kills me. I guess that is about all I can say about it. Q. Now, how long were you in bed from these injuries before you were able to get out of bed? A. About six months. Q. How long were you disabled so you coudn't walk on your leg at all? A. Oh, it was, I suppose, seven months before I could get around by myself at all. Q. Now, can you describe to the jury so that it will appear on paper what use, if any, you can make of the hands or the wrist? A. The only one I can use is the thumb. Q. One thumb on which hand? A. The left hand. The thumb on the left hand is all I can use, the rest of them are entirely stiff; I have no use of them whatever. Q. Can you bend either finger on either hand except the thumb on the left hand? A. That thumb is the only one I can bend at all. Q. Now, with reference to walking, how can you walk, what kind of a walk can you make? A. I can walk stiff-legged. The limb is entirely stiff, can't walk very good, nor very long. Q. Which leg is entirely stiff? A. The left leg. Q. How many fingers were burned clean off on that hand? A. The thumb and index finger of the right hand. Q. They were burned off? A. Yes, sir. Q. They are preserved in this bottle (indicating)? A. Yes, sir. Q. They were burned off? A. Yes, sir. Q. What have you been able to do, if anything, in the way of work since then— can you do any work with your hands? A. I can't do any work whatever—I can't dress myself; I can't even feed myself. Q. Who nursed you since you were injured? A. My wife and my wife's cousin. Q. How

long did your wife nurse you? A. Ever since the day of my injury. She is nursing me at the present time. Q. What expense did you incur for medicines—I am talking about liniments and medicines that you used, if any? A. Well, it amounts to several hundred dollars; I have not the exact amount of it right now."

"The Court: What do you mean by several hundred? A. Several hundred dollars for medicines; say two hundred dollars or two hundred and fifty—maybe three hundred. I know the expense is going right on now all the time."

Dr. E. H. Spooner testified for respondent as follows: That he was a physician and surgeon, located in St. Louis. That he attended the respondent when he received his injuries, and first saw him about thirty-five minutes after the injury occurred. "Q. How long has he continued under your treatment? A. He is under my treatment at the present time. Q. Still? A. Yes, sir. Q. He came under your treatment on the 17th day of January, 1905, and has continued under your treatment until now [Dec. 12, 1906]? A. Yes, sir. Q. When you got to him, Doctor, and saw his condition, tell the jury what it was? A. Well, his condition, as I found him, I supposed was practically a dead man. I thought there was no hope for him. The wound was so extensive and the burned flesh exposed, from the extent of the injury I naturally supposed no man could survive it. Q. In detail describe these injuries that were on his hands, his legs and person? A. Can I use the plaintiff to illustrate them on? A. Yes, you can do that. (Plaintiff comes forward and witness exhibits injuries to the jury.) Witness: Starting at the right hand, the condition you see here (indicating) of course was worse than what it appears now. The muscles were burned out half way down to the elbow; all these muscles (indicating) for contracting the hand, these were burned out, with all the tendons, up to the base of the fingers. That (indicating)

all dropped out just like a piece of cooked chicken. These arteries (indicating) were all burned through here (indicating) with the exception of two main arteries here (indicating) and this main artery here was burned through there (indicating) and gave way; I think it was on the second day. That (indicating) is tied in two places here and tied back here (indicatnig) also. Of course, he can't shut the hand. And this (indicating) is false skin; it is just skin we have got from grafting and using things to heal it up. The reason his fingers are in this condition (indicating) is there are no tendons to draw the fingers and I had to put the hands in this condition (indicating) to keep these tendons from throwing the hand back over here (indicating). It is much better to have the hand in this condition (indicating) than to have the hand thrown back on the back of the arm You must remember that all these muscles (indicating) and tendons are burned out entirely, nerves and everything on that hand. This hand (indicating) is burned from here down and almost in the same condition as the other, about two-thirds of the way to the elbow, and the reason there is no movement of these fingers is, there is nothing to work them, nothing to contract them here (indicating). The fingers were placed in this position (indicating) so as not to be sticking out straight in the man's way all the time. Of course these bones (indicating) had to be taken out here (indicating). There is one thing I forgot to state about the right arm. This (indicating) is severed from here (indicating). Of course, the electricity passed through here (indicating) and injured the tendons the same as this (indicating). So all there is to that wrist (indicating) is the bones and a few little muscles in there (indicating) to kind of hold them together. The leg you saw this morning. This (indicating) is the dressing I used. This muscle (indicating) draws the leg in this way (indicating). It is all burned out. I could see the artery

pulsate and I expected to see it burst every minute and that caused us to watch it closely. The object in leaving the leg in this position (indicating) is that the muscles were drawn up, and if that leg was not put in that position it would be in this position (indicating). Of course, he has to be careful, a jar or anything injures the nerves in this foot (indicating). There was a hole burned there (indicating) pretty near the size of a dollar, which affects a few of the main tendons there (indicating) a little bit, but not much; also a hole in the back of his leg, and this one (indicating). Q. Now, Doctor, this man is about as well as he will ever be, isn't he? A. Yes, sir. Q. Will he ever have any use of either of his hands—can he ever do anything with them? A. No, sir. Q. Will he ever get any better from the injury to his leg? A. I believe not; I can't see how he can. Q. His hands are useless and his leg is crippled forever? A. Yes, sir. I forgot to state about the condition of the stomach. A part of the lining of the stomach was evidently burned and also the kindneys. The urine that he passed was completely oxidized—black from the gas, the electricity or oxygen in the blood, and, therefore, the kidneys were more or less affected, which set up an inflammation of the kidneys for probably two weeks, I believe. Q. What would be the reasonable value of your services up to this time? A. Well, a reasonable value, according as I reckon it, would be, I believe, about in the neighborhood of thirty-two hundred dollars."

"The Court: What? A. Thirty-two hundred dollars; it is nearly two years.

"By Mr. Taylor: Up to this time? A. Yes, sir, up to this time.

"Q. Now, in seeing this man in the condition that he is now, describe to the jury what kind of attention you had to give him. A. Well, I had to spend about four to five hours at first—I suppose the first two or three

234 Sup.—28

weeks—a day or more, because the injuries were so extensive on the nervous system and his agony was so great that you could absolutely do nothing with his leg without using chloroform, which is a very dangerous thing to use in his condition, or without injecting very strong doses of morphine. In fact, I had to keep him under the influence of those two drugs for, I suppose, pretty nearly six weeks. Q. What is the usual and customary value of the services rendered by a nurse in such a case as this? A. Well, the minimum fee would be about three dollars a day; anywhere from three to five dollars a day.''

The evidence also showed that while the current of electricity was passing through respondent's body, the blaze shot out through his nose, mouth and eyes.

The evidence also showed that at the time of the injury respondent was earning four dollars a day, or something over a hundred dollars a month.

This record shows that the respondent is in a horrible condition; yes, a most deplorable one; the worst we ever read of where the victim survived. His suffering was intense and unbearable except under the influence of opiates. He is horribly maimed and hopelessy crippled for life, and incapacitated from performing all manner of labor, not even able to care for or feed himself. The evidence shows that his doctor and medicine bills and nurse hire amount to about $4500, and that down to this time he has lost about $6000 in wages.

While this verdict is a large one, yet under the facts as disclosed we are not prepared to say it is excessive.

We have read and carefully considered all the evidence, as well as the instructions given and refused in this case, and we are satisfied that appellant had a fair and impartial trial. In fact, respondent's instructions were more favorable to appellant than it was en-

titled to under the law. They only required appellant to exercise ordinary care toward maintaining its electric wires in a safe condition, while the authorities before cited, with great unanimity hold that it owed respondent in that regard the highest degree of care and foresight. No other rule would meet the necessity of the situation. Electricity is the most dangerous and deadly agency known to man, subtle and invisible, and, ordinarily, incapable of being detected by the unskilled in electricity. For those reasons the law imposes the utmost care upon those who use and maintain that deadly agency at all places where persons have the right to go for business or pleasure.

Having discovered no error in the record as to the defendant railway company, the judgment as to it ordinarily should be affirmed. Since, however, the plaintiff appealed from the judgment against it as to the Union Iron & Foundry Co., the co-defendant of the railway company, which was reversed and remanded for a new trial; and since there can be but one judgment rendered in the same cause (Smith v. Kiene, 231 Mo. 215), the judgment as to the railway company will, therefore, be reversed and remanded, with direction to the circuit court to hold the judgment against the railway company in abeyance until final disposition is made of the case as to the defendant, the Union Iron & Foundry Company, at which time said circuit court is ordered and directed to enter judgment in favor of the plaintiff for the amount of the verdict and six per cent interest to date of said rendition, but said judgment is not to bear interest during the period it stands in abeyance.

All concur, except *Graves, J.*, who is of the opinion that the evidence shows no liability as to the Railway Company, and for that reason dissents from this opinion.

PER CURIAM.—The foregoing opinion of Wood-son, J., handed down in Division No. One of this court, affirming the judgment of the circuit court, is adopted as the opinion of the Court in Banc.

All concur, except *Graves, J.,* who dissents.