T. GRYLE CAMPBELL, RESPONDENT, v. DANIEL C. MYERS, APPELLANT.*

Kansas City Court of Appeals. November 8, 1926.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, p. 853, n. 59; Damages, 17CJ, p. 1064, n. 1; p. 1066, n. 17; Malicious Prosecution, 38CJ, p. 412, n. 48; p. 413, n. 66; p. 423, n. 92; p. 425, n. 9; p. 464, n. 39; p. 502, n. 19; p. 507, n. 40; p. 513, n. 29; p. 516, n. 83, 84.

*U. A. House* and *A. L. Burns* for respondent.

*P. M. Marr* and *W. C. Irwin* for appellant.

ARNOLD, J.—This is an action in damages for alleged malicious prosecution. Defendant is a resident of Green City in Sullivan county, Missouri, and is engaged in farming and in the mercantile

business. He also owned and operated numerous telephone lines and switchboards in Sullivan and adjoining counties. Among others, he owned and operated a switchboard and lines at the village of Green Castle located four miles east of Green City. The Green Castle system was known as the Green Castle Telephone Company. At the time of the occurrence which resulted in the present controversy, plaintiff, who was reared in the community, also resided in Green City. His occupation was that of telephone lineman or what is known in the parlance of the telephone business as a "trouble shooter," and it was his duty to construct new lines and repair and care for lines in use on the report of trouble thereon.

It appears from the record that sometime in March, 1919, plaintiff was employed by defendant as a lineman to take care of defendant's lines and switchboards at the towns of Newtown and Harris in Sullivan county and Lucerne in Putnam county, and plaintiff moved to Newtown. He continued in such employment for a period of fifteen months at Newtown and later at Green Castle for three and one-half months, and outside of steady employment, he worked some by the day now and then for a period of eighteen and a half months. It appears plaintiff's removal from Newtown to Green Castle was brought about by the influence of the patrons of defendant's telephone lines at Newtown. It is defendant's contention that at the end of three and one-half months at Green Castle, plaintiff could not get along with the patrons of defendant's telephone company, and he was discharged by defendant. Thereupon plaintiff moved back to Green City.

In the month of November, thereafter, defendant went to the State of Oregon on business and was gone for six weeks. It is in evidence that while he was thus in Oregon, plaintiff went to the neighborhoods of Harris and Newtown, claimed to be in the employ of defendant, and worked on defendant's lines there about three weeks. Defendant asserts that plaintiff was not in his employ at that time, but that plaintiff went to work voluntarily after defendant went to Oregon. This, however, is controverted by plaintiff. During this period and while defendant was absent from the State, plaintiff went to defendant's switchboard operator at Harris and demanded that she pay him $100 which plaintiff claimed defendant owed him, and the money was paid to him. About a week later, plaintiff demanded more money of said operator, which she refused to pay. Plaintiff worked until 5 P. M. on the day of his last-named demand, at which time he had cut some fifteen telephone lines, intending to place four poles, cut out some old wire to splice with new wire, cutting all said wire at once. It appears that in the evening of that day, plaintiff called defendant's brother Frank, at Green City and demanded more money but was told defendant had made no arrange-

ment for advancing any money to him; plaintiff stated that the work was half done and had to be finished and that if pay was not forthcoming, plaintiff would go home. The pay was not forthcoming and plaintiff went away, leaving the said wires cut and on the ground, thus cutting off communication over the trunk lines into Harris and Newtown. It appears that thereafter amicable relations between plaintiff and defendant were no longer existent.

About the first of the year 1923, and after the relation of employer and employee between plaintiff and defendant had ceased, plaintiff entered the service of the Missouri Power & Light Company at Novinger in Adair county, Mo., as a "trouble shooter." This company, as its name would imply, was engaged in producing and distributing electricity to consumers thereof, in the vicinity where the telephone lines were established. There was an agreement between defendant and the Missouri Power & Light Company whereby the two companies were to use the same poles for their wires leading into Green Castle, and defendant's telephone wires were attached to the poles owned by the power company, under said agreement. Six of defendant's lines were attached to the power company's poles running east from Green Castle, three being on each side of the poles. A short distance east of Green Castle there was what is known as a "two-pole turn" in the line of power and telephone wires. The two poles were leaning inward on account of improper setting and anchorage, and the power company had instructed plaintiff to straighten the two poles so leaning. There were orders that the work should be done on a Sunday, as the current of the power line had to be cut off during the process, and cutting the power off on Sunday would discommode customers less than on other days of the week.

It is shown by plaintiff's testimony that three or four weeks prior to May 27, 1923, he told some of defendant's employees of his intention to straighten the said poles on some favorable Sunday. Plaintiff admits that the exact Sunday on which the work would be done was not specified by him. On Sunday, May 27, 1923, plaintiff decided to straighten the said poles and had arranged with the Power & Light Company to shut off the power from 9 A. M. to 5 P. M. of said day, during which time the poles were to be straightened. In the morning of said day, both plaintiff and defendant are shown to have been in Green City. Plaintiff did not inform defendant of his intention to do the work on that day but shortly before 9 o'clock in the morning of that day he told defendant's switchboard operator, a young woman, that he was going out to straighten those two poles and wanted defendant to take care of his wires as per the contract with the Power & Light Company.

There is some dispute as to the exact hour when this notice was given. Plaintiff testified it was about 8:30 A. M., or possibly a little later. The operator who received the notice testified that she received it at about 8:55 A. M.; that she told plaintiff that defendant's lineman was away from home in Iowa and would not return until the first of the week and that she could do nothing. It appears in evidence that at no time did plaintiff notify defendant or any of his agents or employees that he was going to cut any of defendant's wires; but there is testimony tending to show that the cutting of all the wires was necessary to a proper straightening of the poles.

Plaintiff proceeded to his task, cutting the wires of both the Power & Light Company and defendant. He cut defendant's wires on both sides of the cross arms on the two poles and allowed them to lie as they fell, in a more or less tangled condition. He then straightened the two poles and reconnected the wires of the Power & Light Company but did not reconnect the telephone wires, on the theory that under the existing contract, "they should take care of their own wires." It appears defendant had no information as to what plaintiff had done until the following day when complaints were received from patrons of the telephone lines. On investigation, defendant learned of the notice given his switchboard operator the previous day. Defendant's lineman returned from Iowa on Tuesday follow- and on that day the lines were repaired, communication over the wires having been cut off during the period from Sunday until Tuesday.

Thereupon defendant wrote the Power & Light Company in regard to the cutting of the wires, receiving a reply from said company disclaiming any responsibility for plaintiff's act and stating that he cut the wires without instructions from them so to do; that they could not understand why he would do it and that they had no objections to defendant's prosecuting Campbell for his act. Thereupon defendant wrote a letter to the prosecuting attorney of Sullivan county, as follows:

"Green City, Missouri,
"June 4th, 1923.

"Mr. P. M. Marr,
"Dear Sir:
"Milan, Missouri.

"On last Sunday week ago Mr. J. Gryle Campbell an employee of the North Missouri Power Company went out on our line east of Green Castle and cut six of our telephone lines each one in six places; that is to say both sides of three telephone poles on electric light poles and left them lay on the ground cut to pieces. We at once took it up with the North Missouri Power Company and we are enclosing you their letter in which they positively deny any re-

sponsibility for his vicious acts, such as he quite often commits as you will see from this letter. I am asking your advice as I hardly see how we can tolerate such treatment in a nice, civilized community as we have always been good friends to the Light Company, and they to us. We had no knowledge of his intention to cut down our lines, so please let us hear from you, and also please return the letter from the North Missouri Power Company as I want to keep it for my files, but am sending it to you that you may fully understand that the company has no responsibility in his acts. I have not lately looked up the law but years ago an act such as he committed the limit was two years in the penitentiary.

· "Respectfully,<br>"D. C. MYERS."

The letter of the Power Company enclosed therewith was as follows:

"June 2nd, 1923.

"Mr. B. C. Myers,

"Green City, Missouri.

"Dear Mr. Myers:

"Your letters were both sent to Novinger and there was some delay in receiving them as our office is now in Edina. I don't get to Novinger very often. In regard to the burn out you had on account of getting crossed with our wires I have sent the correspondence to the Excelsior Springs office and you will hear from them in due time. In regard to the trouble you had at Castle on account of Mr. Campbell cutting your wires, we beg to advise that he did this without any instructions from us to do so and I cannot understand why he would do it. We had an agreement with you to use our poles for your wires in the places where we overbuilt you, and we intend to live up to that agreement or make some other arrangements with · you, but at no time do we intend to do any damage to your property.

"We appreciate the fact that our relations with you have always been pleasant and that you have been good supporters of our service and regret very much that Mr. Campbell has committed this act against you and hope that you will not feel that any of the Company have given him any such orders. I will reprimand him for doing it, and we would have no objection to your prosecuting him if it could be done without this company becoming involved.

"I will call on you the next time I am in Green City and talk the matter over with you. You can be assured that this company does not intend to do anything to antagonize you but will cooperate with the telephone company in every way possible.

"Yours very truly,<br>"Local Manager."

On June 9, 1923, the prosecuting attorney replied to defendant's letter indicating he believed plaintiff's act complained of constituted

an offense as defined by section 3382, Revised Statutes 1919, and that if defendant so desired, the matter would be taken up for criminal prosecution. Without a request from defendant so to do, the prosecuting attorney prepared an affidavit charging plaintiff with the criminal offense of malicious injury to defendant's telephone lines and informed defendant that he might go before a justice of the peace and execute and file the affidavits. Upon June 14, 1923, defendant executed said affidavit and filed it before a justice of the peace. Plaintiff was arrested, brought before the justice of the peace, and pleaded not guilty, waived preliminary hearing and gave bond for his appearance in' the circuit court. In due time the prosecuting attorney filed an information in the circuit court of Sullivan county, charging Campbell with said offense. Upon trial of the case, Campbell was acquitted and thereafter brought this action in damages against Myers based upon his arrest and acquittal. The suit was instituted in Sullivan county, but upon application of plaintiff, a change of venue was allowed to the Putnam circuit court, where it was tried.

The petition alleges that defendant maliciously and without probable cause procured plaintiff's arrest; that plaintiff was arraigned, pleaded not guilty, waived preliminary hearing and was held a prisoner for a period of seven days, at which time he was admitted to bail in the sum of $500. Judgment is asked in the sum of $5000 actual and $5000 punitive damages.

The answer is, first, a general denial, and as affirmative defense, alleges that defendant in good faith consulted the prosecuting attorney before executing the affidavit upon which plaintiff's arrest was effected, and that the same was executed upon the advise of said prosecuting attorney; and that thereafter said prosecution was wholly in the hands of said officer; that the said prosecuting attorney thereafter filed an information in the circuit court upon which the prosecution was based. Thereupon defendant filed a motion for judgment on the pleadings, which was overruled.

The reply was a general denial. The cause was tried to a jury resulting in a verdict and judgment for plaintiff in the sum of $250 actual damages. No punitive damages were allowed. Motions for a new trial and in arrest were ineffectual and defendant has appealed.

It is charged the court erred in overruling defendant's motion for judgment on the pleadings. In support of this charge it is urged that, as plaintiff alleged in his petition, at the arraignment on the criminal charge he waived preliminary hearing and gave bond for his appearance; that this fact admits probable cause for the making and filing of the affidavit by defendant. It is plaintiff's position that the overruling of defendant's motion was proper because, in addition to showing the waiving of preliminary hearing, the petition

pleads a trial and acquittal on the criminal charge and that the petition alleged all the necessary elements of malicious prosecution.

It has been held repeatedly that an indictment by a grand jury is prima-facie evidence of the existence of probable cause, unless the same is overcome by a showing in evidence that the indictment was obtained by false or fraudulent testimony, or through improper means, or by evidence tending to show that defendant did not believe plaintiff to be guilty. [Steppuhn v. Railroad, 199 Mo. App. 571, 204 S. W. 579; Van Sickle v. Brown, 68 Mo. 627, 637; Wilkinson v. McGee, 265 Mo. 574, 586.]

The general rule is stated in 38 C. J., p. 412, par. 46, as follows:

"While the waiver of a preliminary examination and the giving of bail for appearance is not such an admission of guilt as will preclude the party from sustaining an action for malicious prosecution, it raises a prima-facie presumption of probable cause for the prosecution, which presumption, however, may be overcome by competent evidence on the trial."

The waiving of a preliminary hearing, while constituting prima-facie evidence, may not be accepted as a confession of guilt, and being only a presumption, may be overcome by evidence. [Steppuhn v. Railroad, supra, and cases therein cited.] We hold that, under the law, the court was not in error in overruling the motion for judgment on the pleadings, notwithstanding the fact that the motion was interposed before there was opportunity for plaintiff to introduce evidence sufficient to overcome the presumption of probable cause. We have carefully examined the very able brief and citations of defendant's counsel on this point, but fail to find therein anything contrary to this holding.

It is charged there was no evidence to support the verdict in this case; that the burden was upon plaintiff to prove want of probable cause. This position, of course, involves the question of total failure of proof of want of probable cause. The rule is that if there was any substantial proof of want of probable cause produced in behalf of plaintiff, there arose a question for the jury's determination, and this court is not authorized to interfere with the jury's finding on that point. The record discloses there was testimony tending to show that plaintiff had notified defendant, or his agents, three weeks and six weeks prior to the time the wires were cut, and, in fact, on the very day they were cut, of the orders from the Power & Light Company that the poles must be straightened, and of plaintiff's intention and plan relative thereto on the first favorable Sunday. There was also a showing that there was a necessity that the wires be cut to accomplish the purpose, and that under the existing contract between the Power Company and the Telephone Company, the latter must take care of its own wires.

There was also evidence tending to show that defendant did not give the prosecuting attorney the facts just mentioned prior to the preparation by the prosecuting attorney of the affidavit upon which the arrest was made. We think this testimony quite sufficient to take the case to the jury under the rule announced in the cases above cited, for their determination of the question of probable cause.

Defendant urges there was no malice on the part of defendant shown. In answer to this statement we need only refer to defendant's evidence, as follows:

"Q. Is it not true you have reference to the fact that you don't like him? A. I don't like him very well.

"Q. Mr. Myers you say your feelings are not good toward the defendant? A. Not very good.

"Q. And it is because of your malice this prosecution began? A. He did so many things I had to do something.

"Q. Your feeling in this case prompted this prosecution? A. I had to stop him some way.

"Q. You did say he had been unfriendly to you and you were basing that on your feelings? A. Yes, sir."

It is true that ill will or hostile feelings of defendant against plaintiff are not necessarily proof of malice. Malice has been defined as a wrongful motive which prompts a wrongful act. [Words & Phrases, Vol. 3, 232.] Therefore it has been held that the institution of criminal proceedings with any other motive than that of bringing a guilty person to justice is a malicious prosecution. [Rulison v. Collins, 82 S. W. 748; Johns v. Marsh, 52 Mo. 323; Harpham v. Whitney, 77 Ill. 32.] Actual malicious purpose or personal ill will is not essential to constitute the legal malice which must be shown to support an action for malicious prosecution. The malice required to support the action may be inferred by the jury from the want of probable cause. [Connelly v. White (Ia.), 98 N. W. 144.] "Legal malice" as distinguished from "actual malice" and which is sufficient to support an action for maliciously suing out process, but not to support an award of punitive damages, consists in a wrongful act intentionally done, without just and lawful cause or excuse. [Wright v. Harris, 160 N. C. 542, 76 S. E. 486.] In the case at bar the jury heard all the testimony and, doubtless, decided it tended to show legal malice on the part of defendant in instituting criminal proceedings against plaintiff, and we are not warranted in disturbing their finding, under the proof presented. In this we are supported by the ruling in Harris v. Railroad, 172 Mo. App. 261, 157 S. W. 893, and cases therein cited.

This holding decides adversely to defendant the charge that the court erred in overruling the demurrer offered at the close of plaintiff's case and again at the close of all the evidence. Defendant

complains that the court erred in giving plaintiff's instruction No. 3, over defendant's objections, as follows:

"The issue for the jury to try in this case is not the guilt or innocence of J. Gryle Campbell, of the crime charged against him in the affidavit and the information filed by the prosecuting attorney, but the issue is whether, from the facts and circumstances given in evidence the defendant acted maliciously and without probable cause, and on this issue you are further instructed by the court that the acquittal of the plaintiff by a jury in the circuit court is prima-facie evidence that the prosecution was without probable cause, but not conclusive proof of that fact."

The part of this instruction most seriously complained of is "you are further instructed by the court that the acquittal of the plaintiff by a jury in the circuit court is prima-facie evidence that the prosecution was without probable cause, but not conclusive proof of that fact."

It is urged that an acquittal is not sufficient evidence of want of probable cause, but it will be noted the language of the instruction does not contain the word "sufficient" but reads "prima-facie" evidence and we see no error therein.

A charge of error is also directed against plaintiff's instruction No. 7 which is, in part, as follows:

"The court instructs you that if you should find the issues for the plaintiff, you may take into consideration in estimating his damages and award to plaintiff the money expended by him in defending the criminal charge preferred against him by defendant," etc.

It is insisted this instruction assumes that plaintiff expended money in the defense of the criminal action against him and that it was for the jury to determine whether he had in fact expended money for that purpose. We hold this objection good. The only testimony relative to this point is as follows:

"Q. After the preliminary was over or after you were arrested did you employ counsel? A. Yes, sir.

"Q. To defend you? A. Yes, sir.

"Q. And to defend you through circuit court? A. Yes, sir.

"Q. And did you pay them for that service? A. Yes, sir."

It will be noted there is no proof of the amount paid by plaintiff for this purpose. We think the situation here presented was quite decisively and properly met by BLACK, J., in Smith v. Railroad, 108 Mo. 243, 251:

"There is evidence that the plaintiff received the services of three or four physicians, and damages to the amount of $200 are claimed in the petition for debts contracted for medical services; but there is not a word of evidence as to the amount of the charges of these physicians, or any of them, nor is there any evidence as to any other

expenses incurred. . . . If parties will overlook evidence of expenses incurred and yet include such expenses in the element of damages to be allowed they must be prepared for a reversal of the judgment."

The giving of this instruction was error. Said instruction No. 7 is also erroneous in that it told the jury that in awarding damages they might take into consideration the pecuniary loss plaintiff had sustained for loss of time in preparing and making his defense to the criminal case. There is no allegation in the petition that plaintiff sustained any pecuniary loss in making and preparing his defense, nor was there any proof of such loss.

The errors in the instruction might be cured by *remittitur* but for the fact that we are unable to determine to what extent said items entered into the damages awarded by the jury.

It is urged that instruction No. 1 is erroneous because it tells the jury that malice is an inference of law from want of probable cause. We have already discussed this question and determined same against defendant's contention. For reasons above stated the judgment is reversed and the cause remanded. *Bland, J.,* concurs; *Trimble, P. J.,* absent.