GEORGE NEAL, Appellant, v. CURTIS & COMPANY MANUFACTURING COMPANY, Appellant, and ST. LOUIS MERCHANTS BRIDGE TERMINAL RAILWAY COMPANY, Respondent.—41 S. W. (2d) 543.

Division One, July 28, 1931.

392

*Wm. R. Schneider* for appellant Manufacturing Company.

*Mark D. Eagleton, Gilbert L. Whitley, James A. Waechter* and *Allen, Moser & Marsalek* for respondent Neal.

*Mark D. Eagleton, Gilbert L. Whitley, James A. Waechter* and *Allen, Moser & Marsalek* for appellant Neal.

396

*J. L. Howell* and *S. P. McChesney* for respondent Railway Company.

STURGIS, C.—The two appeals in this case have been consolidated and heard as one. The plaintiff sued and recovered, by a jury verdict, $10,000 for personal injuries against the defendant Curtis & Company Manufacturing Company, a St. Louis corporation. The suit was also against the St. Louis Merchants Bridge Terminal Railway Company, defendant, but the jury found for that company. The defendant Manufacturing Company has appealed from the verdict and judgment against it, and the plaintiff has appealed from the verdict and judgment in favor of the Terminal Railway Company.

Plaintiff's alleged injuries were received in this way: He was an employee as a common laborer of the defendant Manufacturing Company in its plant and yards in St. Louis. The plant and yards were quite large and enclosed by a fence. A switch track of the defendant Railway Company entered the yards through a gate and connected with several switch tracks extending to various departments of the plant. Previous to the accident in question, a box car loaded with red clay had been set on a switch track alongside of a bin or clay shed for the purpose of having the clay unloaded into such bin. On the occasion in question plaintiff was directed by his employer, the Manufacturing Company, to assist with another laborer in unloading this car of clay into the clay bin or shed some three or four feet from the box car and track. This was done with ordinary scoop shovels, and plaintiff's alleged injuries were received while he was shoveling clay from the box car into the bin. The cause of his injury was that while plaintiff was thus at work a switch engine of defendant railway came into the yards of the

Manufacturing Company and commenced switching cars, and finding it necessary to move this car where plaintiff was at work proceeded to couple the engine to the same. The impact of the moving engine with the standing car in making the coupling was with such violence, though perhaps not extraordinary, that plaintiff was thrown violently forward, falling on his shovel. The nature and extent of his injuries will be discussed later. That he was injured in the manner stated, is not seriously controverted.

Plaintiff's petition alleges negligence on the part of the Manufacturing Company in failing to warn plaintiff that this switch engine would or was likely to collide with the box car in which plaintiff was at work, although it knew plaintiff was at work there and knew, or by reasonable care should have known, of plaintiff's danger; that such defendant failed to warn the defendant railway or its agents or servants operating such switch engine that plaintiff was at work in said car and likely to be injured by such collision, although it knew that such coupling and collision was about to take place; that such defendant negligently ordered and required plaintiff to work in said box car when it knew, or should have known, that such car was likely to be collided with and of plaintiff's danger therefrom; that such defendant carelessly and negligently suffered and permitted the switch engine to run into and collide with the box car in which plaintiff was working. The substance of the alleged negligence of defendant Manufacturing Company is that it violated its duty to furnish plaintiff a reasonably safe place in which to work, in that it neither warned plaintiff that this switch engine was about to collide with the car in which he was working, nor informed the trainmen operating the switch engine that plaintiff was at work in the car about to be moved.

The negligence of the Railway Company is charged to have been along the same lines in running the engine into and colliding with the car where plaintiff was at work without any warning to him; in failing to warn plaintiff that the switch engine was about to collide with said box car, and in failing to discover and ascertain that plaintiff was at work in such car before colliding therewith in making the coupling.

The answer of each defendant was a general denial only—no plea of contributory negligence, assumption of risk, or affirmative defense of any kind. The pleadings, therefore, narrowed the issues to the question of whether plaintiff was injured by defendants, or either of them, and whether such defendant was guilty of negligence in doing so. The extent of plaintiff's injuries was also put at issue.

Most of the facts are not in dispute, the conflict being mostly as to the extent and permanency of plaintiff's injuries. For con-

venience, we will designate the Curtis & Company Manufacturing Company as defendant, unless otherwise indicated.

The evidence shows that plaintiff had been in defendant's employ as a common laborer about a year and on the morning of the day in question he and another laborer named Odell Woods were directed by defendant's superintendent to unload the car of clay by shoveling same into the bin or clay shed opposite the south door of the car. They worked at this till after their noon lunch and had the work near completed. They were instructed to push the work along so as to release the car and save demurrage. It appears that the switch engine of the defendant railway came to defendant's yards daily to switch and spot cars for defendant and also bringing in and taking out material and products. This plaintiff and the other workman were anxious to finish unloading this car before the switch engine came and were intent on their work. When the switch engine came into defendant's yards from day to day the crew operating same received instructions or what is termed a ''racket,'' giving directions as to movement and switching of cars. On the day in question the switch engine came into the yards about one-thirty or two o'clock in the afternoon, and the ''racket'' received from defendant Manufacturing Company required, among other work, the moving of cars onto the switch track on which stood the box car where plaintiff was unloading the clay, making it necessary to move that car. The switch engine proceeded to move this car and to do so backed against it to make the coupling. The sudden impact jarred and moved this car, causing plaintiff to fall on his shovel.

The evidence is uncontradicted that no one gave plaintiff or his companion any notice or warning of the presence of the switch engine or its intended coupling with this car. The plaintiff testified that at the time of the impact he was intent on his work, had filled his shovel with clay at the west end of the car, carried it forward to the south door in the middle of the car which stood open for that purpose, and was in the act of throwing the clay into the clay shed or bin when the sudden impact came causing him to stagger and fall forward, and that he would have fallen out of the car door had not his companion caught him. He testified, as did his companion, that he had no knowledge, notice or warning of the presence or movement of the switch engine and the collision came wholly unexpected by him. He said that on other occasions while doing this kind of work he had been notified of the intended movement of the car where he was working, and that he would then stop his work.

From this statement of the dominant facts, it is apparent that someone was at fault and blamable for this accident. No one attaches any blame to plaintiff, nor is it claimed that this was a pure accident with nobody to blame. The two defendants practically con-

cede that one or the other was guilty of negligence in permitting or bringing about this collision of which plaintiff was the innocent victim, and we find each defendant placing the blame and negligence on the other. Thus the defendant Manufacturing Company insists that "the proximate cause of the plaintiff's injuries, if any, was the *co-defendant* Railway's negligence in failing to warn the plaintiff that it was about to strike the car in which he was working," and again that the court erred in giving instructions "which relieved *co-defendant* of a duty (that of warning), the failure to perform which was the proximate cause of plaintiff's alleged injuries." On the other hand, the respondent Railway Company justifies the court's action in giving instructions under which the jury exonerates that defendant and asserts that "the verdict is for the right party and should not be disturbed." The plaintiff agrees with defendant Manufacturing Company that the court erred in so instructing the jury that defendant Railway Company escaped liability, and agrees with the Railway Company that the Manufacturing Company is liable.

The only evidence for plaintiff as to how this injury occurred, except in rebuttal, is that of plaintiff and Odell Woods, who was working with him in unloading this car. Plaintiff's evidence as to how he was injured is in substance: "I was shoveling clay out of the car. The switch engine came and struck the box car, and I was just in the act of heaving the shovel, and that put the shovel and me on the floor and hit me from the back and hit me right over on the corner of the shovel. The shovel struck me in my privates and my back struck against the door. I remember Woods pulling me back in the car. No one notified me that the engine was going to strike that car. I did not hear any bell or whistle from the engine. None of the company's men in the yard came and told me or Woods that the engine was coming. I had no knowledge that it was coming. The custom there about notifying men working in a car about when an engine was coming was that Mr. Griggs or Stanley Hall (yard foremen) would come and tell us, and the switch enginemen would come. That was the manner in which they notified the workmen in the car that the engine was coming. Neither of these men told me that day that the engine was coming, nor did either the engine crew, switchman or brakeman tell me that the engine was coming. I did not hear a bell or signal and I did not have any knowledge of its coming at all."

On cross-examination he testified that he had worked for Curtis & Company about a year before this accident. "During that time I had been working in the yards loading and unloading cars and doing everything a laborer had to do. During that time there were a good many cars brought in and taken out of there. It

was customary for a switch engine to come in there often every day in order to bring in cars and set out cars and do things like that. Out at the plant they had a big gate which they kept closed most of the time. When a switch engine comes up there and stops, in order to get in through the gate, they never blew a whistle, or I never heard one. The gate stood open during the day. I and this other man wanted to get this car unloaded before the switch engine came, and if we got the clay out earlier we would get paid more for it. We had probably an hour and a half or two hours' more time to finish this job before the accident happened. At the time, I had gotten on the right side a shovel full of clay and I had come back getting ready to throw this clay into the clay shed, and at that time I was standing in the door, my foot was on the sill and my back was braced up against the door. When the coupling came I fell forwards. I did not fall out of the door. The shovel was at a right angle to my body as I was standing there and this coupling was in back of me and I was braced against the door at the time. It did not throw me out, but I fell toward the east. The handle part of the shovel struck me on the right side below the groin. I and the other boy were working hard to get the car finished before the engine got there and I was putting my mind entirely upon what I was doing. Nobody told me anything that the switch engine was coming. There is no question in my mind when I fell that I fell forward or that my crotch struck the handle of the shovel. As a result of striking the shovel right about my crotch I became unconscious and was shaking quite a while so that I did not know where I was for a few minutes. I did not know what struck me. When I came to so that I realized what was going on, Woods was standing over me holding my hand.''

The evidence of Odell Woods, who was working with plaintiff in unloading the car, corroborates that of plaintiff in all essential respects. Among other things, he testified: ''On that day we started to work about 7:15 in the morning. Neal and I were the only men working in the car that day. Hall and Griggs were our foremen. We were unloading clay from that car, putting it into the clay bin. The clay bin was right alongside of the box car, but you had to throw it upward from the floor of the box car to throw it into the window. The car I was throwing the clay from was, I guess, *about a block from the gate where they came in, an average city block*. I was working in the south end of the car. I happened up there with a shovel of dirt at the same time Neal did. He attempted to throw and at that time the engine hit the car. I dropped my shovel, too, and I saw him stagger on some dirt in front of the door in the box car. Neal seemed like he was unconscious. I helped him out of the car and set him by the fence and went to tell Mr. Griggs

that he was hurt. He was our foreman. When this coupling took place I was not thrown down. I just staggered, but I dropped my shovel. Neal was walking up and he was stumbling and staggering when I caught him. I don't know how often I saw the switch engine come in there. They would take the car away with the switch engine every time we unloaded one. Some days they would blow a whistle and some days they would not. If I was inside of the car when the bell rang or the whistle blew, they would come around and notify us to get out of it. Then I would get out. They would notify us that they were coming in to switch and tell us to get out. The ringing of the bell and the blowing of the whistle, I guess, didn't mean anything to me. Sometimes it might be when they had been switching another car. It didn't mean nothing to me. They might be ringing the bell and blowing the whistle up by my car and I would not pay any attention to that because they didn't notify us to get out. If they notified me, I would get out. I would stick right to my job until they told me to get out. The only time I knew of the presence of the switch engine would be when somebody would come into my car and tell me to get out and I would see a switch engine there.''

Having introduced this evidence, the plaintiff rested, and on separate demurrers to the evidence the trial court ruled that plaintiff's evidence authorized a submission to the jury of the liability of each defendant. Each defendant then introduced evidence to refute its own negligence and incidentally placing the blame, to an extent at least, on the other defendant.

The theory of non-liability on the part of the defendant Railway Company is shown by the evidence of M. A. Brewer, foreman of the switching crew operating the switch engine causing the injury, who testified that his crew consisted of two switchmen and the fireman and engineer, and further: ''On that day we arrived at the Curtis & Company plant about one-thirty. We came from the east. Before we could get into the company's plant the gate had to be opened and a man by the name of Brewster had the job at that time. In order to notify the Curtis & Company plant, we blew the whistle four times. Then someone would come and open the gate. I won't say positively the bell was ringing when we came up to the gate. After we went in the gate the bell was ringing. When you go switching a plant they give you what is called a racket, giving you the movement of cars and tells you what is to be done. On this day I had a racket. Every time I switched there I was given a racket. I instructed the other two men to get this car. The foreman who opened the gate usually comes out and looks the train over to see what we have in the train, but I don't remember as to this occasion. I saw this box car standing there and really could see inside the curve. The box-car door was open on the inside of the curve,

but I saw no sign of life. It wasn't open on the north side. They were unloading in the bin. I was not able to see anyone about the car and saw no one pitching clay out of there. The object in coupling onto that box car was that we had a couple of cars to be set in behind it, a car of coal and a car of clay. It was necessary to move this car to put the others behind it. I was told to do this. I was not advised or notified of anybody's presence in that box car. I saw no activity and didn't see or believe there was anybody in the car. We whistled four times within the nearest point of the office. We got those two cars and set them in on this track and then switched the entire plant and went back to this track to spot those cars. It took about forty minutes. After we blow our whistle, our crew don't go out and look in the box cars for men. I saw this box car and there was no activity or anything around it. There was no custom other than blowing the whistle. We would ring our bell pretty much all the time while we were switching around the plant.''

On cross-examination he said: ''I knew this box car was being parked right alongside of this bin used to put clay in. I saw this box-car door open on the side that led to that storehouse for the clay, but I didn't go down to see if there was anyone in it. I got my written orders to move cars from Mr. Brewster, who was Curtis & Company's man. I got them from him at the gate, and they indicated that I had to move cars behind this box car. The only way to move them was to move the box car. I had to move it in order to do the work Brewster wanted me to do. My crew went down against that box car with the engine. I found out afterwards that a man claimed to be hurt. None of Curtis & Company's men told me there were any men in the box car. After we got our orders it was about a minute and a half or two minutes before we coupled on this box car. We got our orders and went right down after it.''

The other members of the switching crew all testified that they had no knowledge or information whatever that plaintiff or anyone was at work in this car; that there was no sign or indication of anyone working or being in this standing car, and that they had no such knowledge or information; that they observed the car and its surroundings and had no reason to think that a workman might be working there.

The defendant Manufacturing Company's theory of its non-liability for plaintiff's injuries is reflected in the evidence of Ben Griggs, yard foreman of that company, who testified: ''I know George Neal, the plaintiff in this case, and he worked under me while I was a foreman out there. I gave him instructions in regard to the work of unloading freight cars out there, and I gave him and all the boys instructions pertaining to the coming of switch engines into the yard. I always told them when they heard the switch engine

blow four times, to get out of the car, or if they heard the bell ring. I recall I told that to George Neal. When I heard the bell ring or the whistle blow, I did not, in addition to the general notice, go and see them each time I heard the whistle blow and tell them to get out of the car. I would be working somewhere else at that time and it would be impossible for me to go around there. I did not devote my whole time telling these men to get out of the cars. I thought they would know better, when they heard the bell ringing or the whistle blowing, to get out."

And on cross-examination he testified: "I told every man, 'Every time you hear the bell ringing or hear four whistles, you know a train is coming in and get out of the box cars.' If they did not hear the bell or whistle, that was not up to me. I guess it was up to Mr. Brewster who was handling the crew. I have notified men in the car every since this accident and even before the accident, every since I was switching. There was no other custom. Any man could hear the train coming down. I did not notify them at that time. Brewster was doing the switching then. Since I have been switching I would tell the enginemen to notify the men down in the car, tell him to whistle. When he comes in he blows the whistle without me telling him. They could hear the engine. At all times they could not see the engine, but you could hear the bell or the whistle. The box car was about 200 feet from the gate where the train entered on the day it was hit. I sent them to work there that day, but I didn't go around there. Between the time I instructed them to go there that morning and the time this box car was hit, I never said another word to them. There wasn't anything else to say, except be careful. I notified the men that were working in the cars that whenever the whistle blew or the bell rang, they were to get out. When I heard the whistle blow or the bell ring I did not go each time and tell the men to get out."

Stacy Brewster testified that he was employed by Curtis & Company and was in the yards the day George Neal claimed to have been injured. "I was switching at the time. By switching, I mean I go out and tell the foreman where to move the cars from one track to another, and what went in and what went out. When coming into the company's plant the custom is for the railroad to blow four whistles. They would also notify me to come out and switch. I had charge of the gate and opened the gate and let them in that day. It was not our custom to go around and notify any men that might be working in the cars, after I had opened the gate. When they heard the whistle or bell sounded the men would get out of the cars. They knew they would get hurt if they were in there. We had general orders from the superintendent and yard foreman about that. I notified the men that when they heard the whistle, that meant the

switch engine was coming in and for them to get out of any car, that they might be moved. I was there and heard the whistle blown before I let them in, and when the switch engine started into the yard the bell was ringing, and it was shortly afterwards that Neal claimed he was hurt. Our plant had switching done every day. On this day I did not know Neal and Woods were working in this car. I did not have time to find out if there was anybody in the car. We presume there is not. By the whistling of the train and the bell they are supposed to get out. I did not see the engine going down towards the box car. I went up to the other end to open the gates. I did not know what he was going to do there. I gave the foreman orders what to do.''

I. The defendant Manufacturing Company insists that its demurrer to the evidence should have been sustained and states as its reasons: ''The proximate cause of plaintiff's injuries, if any, was not the master's failure to warn or provide a safe place to work, but the striking of the car by the railway defendant's locomotive combined with the railroad crew's failure to warn the workmen in the car as was its custom, according to plaintiff's testimony, not denied by the railroad crew. The master knew nothing about the railroad's intention to move the car in question.'' This statement is not in accordance with the evidence, as we read it. The evidence does not show that it was a uniform custom of the switching crew to notify workmen in cars about to be moved. The plaintiff's evidence was that such workmen were notified, when working in cars, when same were to be moved and that they did not cease work merely because a switch engine might be working in the yard, unless they knew the particular car was to be moved. It was not shown, however, that the switching crew were the ones who looked after giving this notice or the ones who in fact gave such notice. The switching crew would not know in what cars the defendant's workmen were at work unless such information was received from defendant or the precaution was taken to inspect a car before moving same. There is no claim that defendant Manufacturing Company did on this occasion notify the switching crew that men were at work unloading the clay in the car in question. The switchmen testified that they did not undertake or assume the duty of inspecting cars they were about to move to ascertain if men were at work there, but that they did use care in their work and if there were any visible signs of workmen about or in a car or reason to apprehend danger to workmen therein, they would not make a coupling without notifying such workmen. Nor can we assent to the statement that the evidence conclusively shows that defendant knew nothing about the railroad's intention to move

the car in question. The evidence is that on entering the yards the switchmen received a racket specifying the switching to be done and cars to be moved. The foreman of the switch crew testified that on this occasion he received this racket which directed the movement of two cars onto the same switch track in such position as necessitated the movement of the car in question where plaintiff and his companion were at work. Due care on the part of the defendant's agent making this racket would charge him and defendant with notice that this car must be moved by the switch engine, endangering the safety of the workmen unless they were duly warned. This, we think, imposed on defendant the duty to notify the workmen direct of the impending danger, or at least notify the switching crew of the presence of these workmen in the car. It was, of course, the primary duty of defendant Manufacturing Company, in whose employ the plaintiff was doing this work, to furnish and maintain for him a safe place to work, which carries with it the duty to warn him against dangers known or which could reasonably be known to the master and not to the servant. [Weaver v. Railroad, 170 Mo. App. 284, 289; Miller v. Railroad, 109 Mo. 350, 357; Johnson v. Brick & Coal Co., 276 Mo. 42, 50; Hutchinson v. Safety Gate Co., 247 Mo. 71, 115; Kame v. Railroad, 254 Mo. 175, 190.] In Weaver v. Railroad, supra, this court said: ''In attempting to cast the whole burden of the duty he owed his servants onto the employees of the Railroad Company Scanlon (who had charge for the Pullman Company) was guilty of a negligent breach of duty for which the Pullman Company should be held to respond in damages.'' We need not now stop to consider whether defendant could relieve itself of liability in this respect by instructing to or imposing on the switchmen the performance of this duty. It might well be held that the Railway Company and its switching crew would become the mere agents of the defendant Manufacturing Company in the discharge of this duty, since the railway was doing the work of switching cars in defendant's plant, and for it, according to and under its directions. [Weaver v. Railroad, 170 Mo. App. 284, 289; Johnson v. Brick & Coal Co., 276 Mo. 42, 57.] In this last case the court said: ''The mere fact that the former may have neglected to give the notice to the plaintiff in no sense excused the latter from doing so. It owed the plaintiff the same duty the Railway Company owed him, and under the law it had no authority to delegate that duty to someone else. We decided the same question against the Railway Company in paragraph one of this opinion, where it attempted to unload the burden of its sins upon the Coal Company because the latter had been in the habit of warning its employees of the intended movement of cars about the chute. Now it is trying to retaliate by showing that the former did not observe the rule read in evidence. This cannot be

done.'' At any rate, defendant Manufacturing Company cannot be released of liability on the theory that the Railway crew's failure to warn the workmen in the car was the independent, intervening, proximate cause of plaintiff's injury, as is here contended, under the doctrine announced in Washburn v. Laclede Gaslight Co., 202 Mo. App. 102, 115, approved by this court in 223 S. W. 725. The workmen in this car were there solely because defendant put them to work there, and it alone directed what cars were to be moved in switching. The defendant did, in effect at least, order this particular car to be moved because its movement was necessary in carrying out defendant's order to move and place on this switch track certain other cars. We might grant, as defendant argues, that if this switching crew had moved this car without any orders to do so, and of its own motion, and without its being necessary to do so in order to carry out the orders given it by defendant, then the Railway Company, and not this defendant, would be liable for failure to notify the men working in the car; but here the Railway Company was doing just such work for defendant as defendant directed and the movement of this car was within the scope of its orders.

The rule that where each of two defendants owes a duty to take steps to avoid injury to a plaintiff, neither can escape its liability by showing that the other was negligent and but for its negligence the injury would not have happened, is illustrated by Taylor v. Grand Avenue Railway Company, 137 Mo. 363, where two street railroad cars of different companies collided at a crossing, injuring a passenger. Each motorman testified that he had the right of way because of a signal of the crossing flagman, the agent of both companies. The court held that though one of the companies was right and the other wrong as to following the signal, yet that the one which was right in this respect would nevertheless be liable if it was negligent in not using care in observing what the other company was actually doing and using the means at hand in avoiding the collision. The court said:

"Nor can one of the defendants shift the entire responsibility, in so far as it may affect *plaintiff's*, upon the offender against the agreement, rule, or custom among themselves, when the non-offender could have avoided the accident by the use of care and caution after seeing the danger threatened. . . . Instruction No. 6 is also faulty in that it exempts the defendant cable car company from all liability, if the jury should find from the testimony that the motorman operating the electric car failed to exercise the care and caution on his part required by law in approaching the crossing, thus wholly ignoring the question of joint liability of both defendants, if each should be found guilty of carelessness in the manner of approaching the crossing at the time of the accident if a collision was threatened.''

The case of Clark v. Railroad, 234 Mo. 396, and Clark v. Iron & Foundry Co., page 436, being two appeals by the different defendants in the same case, is similar to this case in that plaintiff there sued two defendants, a street railway company and a foundry company, for personal injuries. The injury was from an electric shock from the Railway Company's wires resulting from bad insulation chargeable to it. The Railway Company there occupied the same position as to the dangerous agency as the Railway Company here. It was the servant of the Foundry Company that was there injured and that company, as did the Manufacturing Company here, put plaintiff to work at the place of his injury. Both were held liable to plaintiff, the one for failure to keep its electric wires safe to one who might come in contact therewith (Clark v. Railroad, 234 Mo. 427), and the other for not furnishing its servant a safe place to work in that the place of work was in proximity to the dangerous wires of the co-defendant. The court held that it was the duty of the railway operating and controlling the dangerous instrumentality (in that case an electric current and in this one an engine) to guard against injuring persons who might come in contact therewith; and that it was the duty of the Foundry Company (here the Manufacturing Company), whose servant was injured, to protect him against hidden or unknown dangers incident to his place of work. As bearing on the duty and liability of the defendant Foundry Company, the court there held, page 436, syllabus: "The danger of the place may be the result of the acts of a third party and arise out of a condition over which the master had no immediate control, and yet the master be liable for his servant's jury. . . . It is the master's duty to inspect and ascertain if hidden and secret dangers are connected with the place in which a servant is required to work. He is not absolved from liability for injury to the servant by the mere facts that the dangers were hidden and he knew nothing of them and they were not of his making." In the course of the opinion the court said that it became the legal duty of the respondent "to make inquiry of the Railway Company and to inspect the premises and ascertain whether or not there was any such dangerous agencies connected with or about the premises as would render it unsafe for their employees while working in or about same. If they failed to do this, and there existed such dangerous agencies which rendered the premises unsafe, then they were guilty of negligence toward their employees, and would be liable in damages to any one of them who might be injured thereby." And, speaking of an instruction given, this was said at page 455: "The vice of this instruction consists in the declaration that [if] the danger was a hidden or secret one, and that no warning had been given to respondent or its foreman of such hidden danger, and that respondent

had no knowledge of such danger, then the jury should find for the respondent. It will be observed by reading this instruction that it absolves respondent from all liability provided the danger in question was hidden and respondent had no personal knowledge thereof, and had not been informed of its existence, thereby totally ignoring the duty that rested upon respondent, or its foreman, to make an inspection of the premises and to inquire regarding the hidden or secret dangers that might be in or about the place where respondent's servants were required to work."

In Hutchinson v. Safety Gate Co., 247 Mo. 71, 115, the dangerous agency was an elevator operated by one defendant which injured the workman of the other defendant who put him to work in the elevator shaft. The court held that each defendant owed this workman the duty of warning him of the movement of the elevator in the shaft since each knew, or by due care would have known and could have ascertained, that the workman was there. As applicable to the duty of defendant Manufacturing Company to warn the plaintiff of the movement of the switch engine in coupling this car, the court said: "The law is well settled, that when the appellant put the deceased to work in the elevator shaft to drill the holes, . . . it became its duty to prevent the elevator from descending upon him. And the deceased did not assume the risk arising from the appellant's neglect to use suitable precaution for his safety. And it is no answer to say that the place was reasonably safe when the deceased was put to work in the shaft, for the reason that the duty of the appellant was a continuing one, and if the deceased's position was made dangerous by lowering the elevator, then it was the plain duty of the appellant to have given him timely warning of the approaching danger. [Koerner v. St. Louis Car Co., 209 Mo. 141, 157.]"

This defendant's demurrer to the evidence was, therefore, properly overruled.

II. The defendant Manufacturing Company next complains of the court's refusal to give its Instruction E, which told the jury:

"If you find and believe from the evidence in this case that it was customary for the switch engine of the defendant Railway Company to blow its whistle and ring its bell when it was about to enter the plant of the defendant Curtis & Company, and if you further find that the plaintiff had orders to leave or get out of any railroad box car in which he was or might be working at the time he heard such bell or whistle, and if you find that the plaintiff customarily did so get out of such box car on such occasion, then it was not necessary

under the law for the defendant Curtis & Company to notify the plaintiff personally each time to get out of the car.''

It will be noticed that this instruction does not require a finding that the defendant Railway Company did in fact on this particular occasion comply with the custom mentioned, and this was a disputed fact at least to the extent that plaintiff and his co-worker testified that they heard no such signals. The more serious fault in the instruction, however, is that it, in effect, told the jury that the custom of the switch engine to sound the whistle and bell when about to enter the defendant's plant would be a complete compliance with its duty to warn the men working in any and all cars in the yards that same were likely to be moved in switching. The defendant says that this was its theory of the case and cites two cases, Collins v. Rankin Farms, 180 S. W. 1053, and Williams v. Fleming, 284 S. W. 794, the one holding that a plaintiff is entitled to an instruction submitting this theory of the case when ''justified by the law,'' and the other so holding, ''when there are pleadings and evidence sufficient to support it.'' Both these requirements are necessary and we think are lacking here. The evidence in support of this instruction is to the effect that generally the switch engine gave four blasts of the whistle on arriving at the entrance gate, primarily at least to call someone to open the gate and to serve as notice that the switch engine was there ready to do whatever work the defendant wanted done—that is, receive the racket, as it was called. The bell was generally kept ringing during the process of switching. The evidence also showed that the entrance gate was, as one witness said, a full city block from the car in question, and another that it was 200 feet distant. There were a number of switch tracks extending to different parts of the yard and used for a variety of purposes. It took the switch engine considerable time, sometimes longer and sometimes shorter, to do the work required, and the inference is that all the tracks would not be used every day. Both plaintiff and his companion in this car testified that the mere sound of the whistle or bell meant nothing to them, as the engine might be going to other parts of the yard, and that they never quit work, especially as they were receiving a bonus for fast work, merely because the switch engine was in the yards. In fact, the defendant strenuously argues on another phase of this case that although its yard master made up and gave the switch crew its racket or schedule of switching to be done, he could not be held to have known that this engine on this occasion would move the particular car, yet defendant now argues that the general order and custom for workmen in cars to give heed to the presence of the switch engine on all occasions is the full measure of defendant's duty to warn this plaintiff. We do not so hold. It would also follow that if the general order to workmen to

give heed to the mere presence of the switch engine in the yards was all that was required in the way of warning the workmen then in the cars of the danger that their car might be collided with in switching, then defendant railway would also be relieved of any duty to give further warning, which is contrary to defendant's theory that the railway was jointly, if not solely, liable for failure to give warning of this particular act of switching.

We also think that this is a matter amounting to contributory negligence, which must be pleaded in order to be available. That is to say, if defendants, or either of them, intended to take the position that plaintiff was negligent in failing to observe and give heed to the warning signals given of the presence and approach of this switch engine in making this coupling, and that such negligence caused or helped to cause plaintiff's injuries, then such negligence of plaintiff and the facts showing same should have been pleaded.

Another assignment of error by defendant Manufacturing Company is that the court, at the instance of its co-defendant Railway Company, gave this instruction on the question of damages:

"The court instructs the jury that although you may find and believe from the evidence that the plaintiff is complaining of a condition of his eye, yet you are further instructed that if you find and believe from the evidence that said alleged condition of his eye was not caused by reason of the accident in question, then you will not award plaintiff any damages therefor."

This defendant insists that there was "no evidence that the plaintiff suffered any blow to the head, eye or any other part of the body which could have affected the eye." From the standpoint of defendant railway, and seemingly so from defendant's standpoint, this is the very reason why the court should have given this instruction. If there was no evidence from which the jury could find that a claimed injury was the result of the accident sued for, it would ordinarily be error to refuse an instruction telling the jury to exclude such damages on such finding. Possibly this defendant would have been entitled to a peremptory instruction to exclude this element of damages for want of evidence to support the same, but it did not ask it. The instruction does not broaden the pleadings, as suggested, as it was specifically pleaded that plaintiff suffered a severe injury of the eye as a result of this accident. The defendant railway would doubtless have acquiesced in such peremptory instruction, but it was willing to concede that there was some evidence sufficient to take this question to the jury, and as it was then in the case, had a right to ask instructions from its standpoint. This is not a case like Campbell v. Myers, 221 Mo. App. 858, 287 S. W. 842, 846, and Smith v. Railroad, 108 Mo. 243, 251, where the court submitted to

the jury and allowed it to find for plaintiff an element of damage without there being any evidence to support the same, but rather the opposite, for here the jury was directed to exclude such damage if there was no evidence to support same. To this extent at least, the instruction was favorable to both defendants. We also think it was more favorable to this defendant than no instruction whatever on this subject, and such would have been the condition of the case had this instruction been refused. If the jury should have been peremptorily instructed to exclude this item of damage, this defendant should have so requested it, and not having done so, it cannot complain of a less favorable instruction given for its co-defendant. We are not to be understood, however, as holding that there was no evidence to support this item of damage. Moreover, this defendant did not complain of this instruction in its motion for new trial and cannot do so here.

This defendant complains of Instruction No. 2 given at the instance of its co-defendant Railway Company to the effect that while the Railway Company was required to exercise ordinary care in the operation of switch engines in defendant's yard, yet in the absence of knowledge or of facts sufficient to put it on inquiry, it was not required to peer into each and every car before making a coupling therewith in order to make sure that no one was working in said car, and if there were workmen there, to notify them of the danger. Defendant says that this was at least a question for the jury, and argues: "This was a large plant in which three hundred and forty hourly men were employed; where cars were brought by the co-defendant daily to be loaded and unloaded. The co-defendant (railroad) had reason to believe that men might be in said cars, and appellant contends that when operating a dangerous instrumentality, like a locomotive, before striking a car with it, the agents of the co-defendant should have looked into the cars to warn the men." If this defendant had applied this statement to its own duty and conduct in protecting its own men, it might be more appropriate. Defendant's contention amounts to no more than that this instruction was too favorable to the Railway Company and allowed it to escape liability. No similar instruction was asked by this defendant, possibly on the ground that if it is too favorable to its co-defendant, it is too favorable to it. We cannot say that this instruction can or did prejudice this defendant in any way other than to prevent a joint verdict and judgment against both, and of that defendant cannot complain. [Leighton v. Davis, 260 S. W. 986, 989; Brickell v. Fleming, 281 S. W. 951, 953; Clark v. Railroad, 234 Mo. 396, 424; Beave v. Transit Co., 212 Mo. 331, 355; Maher v. Donk Bros. Coal Co., 20 S. W. (2d) 888, 894.] As said in this last case, "If erroneous, the defendant com-

412

pany cannot avail itself of the error, and the instruction defines (erroneously) the rights of a codefendant." This defendant took the right view of this matter in not complaining of this instruction in its motion for new trial, which alone precludes a review here. The only complaint along this line in the motion for new trial is that the verdict, if justifiable, should have been against both defendants, a right which belongs to plaintiff only. [Hutchinson v. Safety Gate Co., 247 Mo. 71, 111.]

We shall consider this instruction again when considering plaintiff's appeal and agree that as to *plaintiff*, it is erroneous.

The only other complaint of importance by this defendant, other than the excessiveness of the verdict, is the giving of Instruction No. 7 on behalf of the co-defendant. This instruction will be further considered when we come to consider plaintiff's appeal, but, so far as this defendant is concerned, what we have just said with reference to Instruction No. 2 applies here. It is not covered by this defendant's motion for new trial; and it cannot be complained of by this defendant because too favorable to its codefendant.

III. Turning to a consideration of plaintiff's appeal, we find that it is bottomed on the giving of instructions too favorable to defendant Railway Company. The instructions complained of are as follows:

"2. The court instructs the jury that while the law does require the defendant Railway Company to exercise ordinary care at all times while operating its switch engine and switching the yards and plants on its line of railroad, yet you are further instructed that ordinary care, as defined in other instructions given you, does not exact or require the defendant Railway Company, its agents and employees before coupling into or moving a car in the yards or plants on its said line of railroad, to peer into each and every car, to anticipate the presence of workmen therein, for the purpose of discovering and warning them that a coupling will be made and the car moved, in the absence of knowledge on their part or such facts that would convey to them notice or knowledge of the presence of persons in or about said cars.

"4. The court instructs the jury that if you find and believe from the evidence that there was no activity about the car mentioned in the evidence that would apprise the defendant Railway Company, its agents and employees, in the exercise of ordinary care, that the car in question was in the process of being unloaded, then you are instructed that plaintiff is not entitled to recover under or upon the assignment of negligence which charges that the defendant Railway Company was negligent in failing to discover the presence of plaintiff in said car.

"7. The court instructs the jury that if you find and believe from the evidence that at the time and place in question it was and had been a long and established custom and practice for the defendant Railway Company, before being admitted to the plant of the defendant Curtis Company, for its switch engine to blow the whistle four times as it approached the gate of said plant for admittance thereto, and if you further find and believe from the evidence that the switch engine mentioned in the evidence did whistle for admittance to said plant, and the gate was unlocked by an employee of the defendant Curtis Company and said engine admitted to said yard, and that in entering said yard the automatic bell ringer was started and was ringing while in said yard (if you so find), and if you further find that the defendant Curtis Company had notified and instructed its employees, and the plaintiff herein, to stop work and get out of the cars when the switch engine whistled and the bell thereon was rung (if you so find), and if you further find that in order to place additional cars in said yard on the track designated by the defendant Curtis Company, it was necessary for the defendant Railway Company to couple into and move the car in which the plaintiff was working (if you so find it was necessary to move said car), and if you further find that the defendant Railway Company was not notified by the defendant Curtis Company of the presence of plaintiff in said car, and that the defendant Railway Company and its agents and employees upon approaching said car saw no activity at or about said car, or anyone working at or about said car that would apprise them, in the exercise of ordinary care, of the presence of any one being in or about said car, or that said car was in the process of being unloaded, then you are further instructed that the defendant Railway Company was not negligent in coupling into said car, and your verdict will be in favor of said defendant Railway Company."

These instructions were not, as we think, correct guides to the jury in arriving at a verdict. Where a servant of one person receives injuries from the use of a powerful and dangerous agency furnished and controlled by another person in the furtherance of work for the servant's master, each owes the servant the duty of protection. The master whose servant receives the injury owes him the duty to furnish and maintain for him a reasonably safe place to work, which includes the duty to warn him against threatened dangers which the master knows of or can discover by proper care. The party using and controlling the dangerous agency also owes this servant the duty to protect him against the dangers incident to its use, which also includes the duty to warn him against threatened dangers. Both such parties, therefore, may and often do owe the servant this duty to warn not only when they actually see or know

of the threatened danger, but also to use all reasonable care and means of ascertaining and anticipating such dangers. This rule finds application in many cases in which both are held liable.

Here we have already held that the defendant Manufacturing Company, whose servant plaintiff was and who put him to work in unloading this car of clay, and who not only knew of but caused the switch engine to move this car, owed this workman the duty of warning him of the intended movement of the car. The question now is whether the co-defendant Railway Company, whose servants were operating the switch engine, did not owe him the same or a similar duty. The only difference was that the Manufacturing Company knew for a certainty that the plaintiff was at work in this car, but claims that it did not know for a certainty that the switch engine would couple with the standing car, or when, or with what force. The Railway Company did know these latter facts for a certainty but did not know for a certainty that the plaintiff was at work in the car. We have held that there were present sufficient facts from which a jury could find that the Manufacturing Company, whose servant plaintiff was, should, in the exercise of due care, have known that this engine was likely to couple with this car, making a warning to plaintiff necessary. So we also hold that there were sufficient facts present warranting a jury in finding that the Railway Company should have known that a workman was likely to be in this standing car. The car was put at this place by this defendant for the purpose of being unloaded and the inference is that it was to be unloaded and moved the next day to save demurrage. The south door of the car next to the clay shed was open, as it would be in unloading the clay. [Hudgens v. Railroad, 139 Mo. App. 44, 47; Butler v. Railroad, 155 Mo. App. 287, 297.] The defendant's evidence tends strongly to show that the switch crew recognized the danger of there being someone in that car, but depended on the Manufacturing Company to notify it or take sufficient steps to warn such workmen. So, too, the Manufacturing Company, in effect, and directly here, takes the position that it was solely this defendant's duty to warn plaintiff of the engine's approach to this car. The jury might well have found from the evidence that the duty to warn plaintiff rested on each defendant, and, under the law, such duty is a non-delegable one and the failure to perform such duty makes each and both liable.

Applying the instructions heretofore set out to the law and facts, they are not correct guides to the jury to a proper verdict. Through all these instructions runs the idea that due care, so far as this defendant was concerned, did not require it to do more than act carefully on appearances; that if there was no visible activity that would apprise this defendant of the presence of workmen in the car, the de-

fendant was excusable for not knowing they were there; that defendant was not required "to peer into cars" to ascertain the presence of workmen, as said in Instruction No. 2. The court should not have limited defendant's duty to this extent. Due care is always commensurate with the dangers and here the plaintiff was helpless to protect himself and there was a strong probability of his injury from the impact in coupling the car. It should have been left for the jury to say whether it was negligence to have acted as this defendant did on the more or less cursory glance at the car made by the switching crew at the time of coupling, for it is apparent that had they watched the south door of the car for any considerable time, they would have seen the clay being thrown from the car to the clay bin; and therefore the jury might say that it was negligence not to peer into the car under the circumstances. [Dutcher v. Railroad, 241 Mo. 137, 174-5.]

Instruction No. 7 is even more objectionable in that the first half of it (it really amounts to two instructions) is calculated to impress the jury that the giving of four blasts of the whistle on the approach of the switch engine to the entrance gate of the yards and the ringing of the bell while the engine was moving within the yards was in and of itself a sufficient warning to plaintiff of the coupling about to be made, provided plaintiff's employer, the Manufacturing Company, had so instructed the plaintiff.

We have held that as to the other defendant, Manufacturing Company, it was at least a question for the jury to say whether this was a sufficient and adequate warning under the circumstances, and we so hold with reference to this defendant also. The latter part of this Instruction No. 7 tells the jury that if the defendant Manufacturing Company did not notify this defendant Railway Company of the presence of plaintiff in this car, and this defendant did not see any person or any activity about this car such as would indicate the presence of workmen, then defendant was not negligent in coupling onto said car, and to find for defendant Railway Company. As we have already said, even if this defendant did not know positively, that is had not been so told, that workmen were in the car, yet defendant could not, or at least it was for the jury to say whether it could, in exercising due care, rely solely on the absence of any activity apprising it of the presence of workmen in the car.

Johnson v. Brick & Coal Co., 276 Mo. 42, is similar in its facts to this case. The plaintiff sued both the Brick & Coal Company and a Railroad for his injuries received by reason of an engine backing against a coal car on which plaintiff was at work. This car was in the coal company's yards and that company put plaintiff, its servant, to work there. The railroad operated the engine and switched and moved such cars as the coal company directed. Neither company

warned the plaintiff, though it was the custom of the coal company to do this. The court readily held that it was the duty of the coal company, whose servant plaintiff was, and whose duty it was to furnish plaintiff a safe place to work, to see to it that such place was not made unsafe by an engine backing against such car without warning, and this duty to warn arose from the fact that it directed what cars were to be moved. The court said: "The evidence clearly shows that the place where the plaintiff was working, in the absence of notice to him of the approaching train, was dangerous, and that each of the defendants knew of that danger and adopted means to obviate it. All the authorities recognize such places as being dangerous. [Cases cited.] And the plaintiff had the right to assume that the defendants would not imperil his safety by permitting or causing the car on which he was at work to be struck by other cars and moved without notice or warning to him." The railway company denied liability on the ground that it did not know of this workman being on this car, and that the coal company had assumed the duty to warn him when cars were to be moved. As to this, the court said: "It is conceded that the railway company did not perform this duty to the plaintiff, nor to any other of its employees working about this chute, but depended upon the coal company to discharge that duty for both of them. The law is well settled that if one person owes a duty to another, and instead of performing that duty himself, depends upon a third party to discharge it for him, and that party neglects to do so, and the person to whom the duty was due is injured in consequence of said neglect, then the party who owed the duty is liable in damages for the injury resulting therefrom. [Cases cited.]"

Our conclusion, therefore, is that on the merits the case should be affirmed (with or without a *remittitur*) as to defendant Manufacturing Company on its appeal, and reversed and remanded for new trial as to defendant Railway Company.

IV. This, however, raises further serious complications. The defendant Manufacturing Company urges that the verdict of $10,000 damages is grossly excessive. If plaintiff and defendant Manufacturing Company were alone concerned and this contention be sustained, then the error, if any, in this respect could be cured by ordering a *remittitur* to be made for the excess as the price of not granting that defendant a new trial also. But, at plaintiff's insistence, we are granting a new trial as against defendant Railway Company, and what the result of that trial will be, we can only conjecture. Whether or not the present verdict is excessive, as defendant Manufacturing Company claims,

depends to a large extent on the permanency of plaintiff's injuries. That the verdict is very large on the facts presented, is apparent. As near four years will have elapsed since the last trial, this question will be much easier of ascertainment on the next trial, and if the whole case should be retried, we would at once conclude to let this question rest, to be dealt with at the next trial as one not likely to arise again, and if so, a more nearly correct result could be reached then than now. If we should order a *remittitur* now, the trial might demonstrate our error. [Shohoney v. Railroad, 231 Mo. 131, 141.]

The plaintiff insists, however, that the present judgment, or at least the verdict, shall stand and be conclusive as against the defendant Manufacturing Company, both on the merits and as to the amount, regardless of the result of another trial as to the other defendant Railway Company. His suggestion is that this court grant a new trial as to defendant Railway Company only, letting the present judgment or verdict stand in abeyance till after the new trial, and that one judgment be then entered on both verdicts. This suggestion is made so as to conform to the oft repeated and inflexible rule of law that there can be but one final judgment in a case, which must dispose of all the parties and issues involved. [Smith v. Kiene, 231 Mo. 215; State ex rel. v. Blakemore, 275 Mo. 695; Gerber v. Kansas City, 311 Mo. 49, 59.] This suggestion would work out well if the jury on the next trial should either find for the other defendant or should find for plaintiff and against it in the same amount as the present verdict. But if the jury finds for plaintiff on the next trial for a larger or smaller amount than the present verdict, can the court then enter a new final judgment disposing of the case as to both parties and fixing the amount to be recovered by plaintiff at one sum against one defendant and another sum against the other defendant? Surely not in an action for personal injuries sounding wholly in tort.

Joint tortfeasors are jointly and severally liable for the whole consequences of their wrongful act. [Fulwider v. Trenton Gas, Light & Power Co., 216 Mo. 582, 591; Asher v. City of Independence, 177 Mo. App. 1, 7.] And this is true whether such defendants act in concert or independently. [Rogers v. Rogers, 265 Mo. 200, 209; Hubbard v. Railroad, 173 Mo. 249, 256.]

Each and all the wrongdoers who participate in any way in inflicting an injury are liable for the resulting damages—all of it. [Shafir v. Sieben, 233 S. W. 419, 17 A. L. R. 637; Applegate v. Railroad, 252 Mo. 173; Neff v. Cameron, 213 Mo. 350, 360.]

The plaintiff may sue all or any one or more of the wrongdoers at his pleasure and may dismiss or fail of recovery as to one or more without in any way changing the cause of action, affecting the amount of the recovery, or increasing or decreasing the liability of

those sued or remaining in the case. [Asher v. City of Independence, 177 Mo. App. 1; Rogers v. Rogers, 265 Mo. 200, 209; Berkson v. Railway, 144 Mo. 211; Allen v. Forsythe, 160 Mo. App. l. c. 269; Flenner v. Southwest Missouri R. Co., 290 S. W. 78.]

If one person is sued for an injury caused by his negligence combined with that of others, it is no defense that others are also to blame, nor does such fact mitigate the amount of the damages. [Applegate v. Railroad, 252 Mo. 173, 198.] A plaintiff's right to recover and have satisfaction for his injuries, whether caused by one or many wrongdoers, is single, and if he receives satisfaction for same once, whether in court or out of court, from one wrongdoer, he cannot recover any further amount from another wrongdoer. Gerber v. Kansas City, 311 Mo. 49, 60; Dulaney v. Buffum, 173 Mo. 1, 14; Abbott v. City of Senath, 243 S. W. 641, where the court said: "It is a just and well-established doctrine that there shall be but one satisfaction accorded for the same wrong. If one be injured by a tortious act, he is entitled to compensation for the injury suffered, and, if several persons are guilty in common of the tort, the injured one has his right of action for damages against each and all of the joint tort-feasors, and may at his election sue them individually or altogether. But if he receives full satisfaction from one of them, his right of action against the other is thereby extinguished." To such extent was this doctrine carried that the reception of any amount from one or more of the wrongdoers in satisfaction of the claim was held conclusively to extinguish plaintiff's whole cause of action and to discharge all the others, and it is only by statute that a claimant may receive part compensation from one wrongdoer and retain his right to recover the balance from the others. Hubbard v. Railroad, 173 Mo. 249, 255, where it is said: "For his injuries were single. He was entitled to only a single compensation. He has received a compensation, satisfactory to himself from the express company and he released that company. He is not entitled to any other satisfaction, and the defendant is released."

There can be no division of liability or damage against the several wrongdoers based on comparative negligence or degrees of culpability of the defendants participating in the wrongdoing, but each is liable for the whole damage resulting therefrom. [Neff v. City of Cameron, 213 Mo. 350, 360.] There can be no such thing as a jury returning into court in a personal injury action against several defendants based on joint or concurring negligence, a verdict for one amount of damages against one wrongdoer and another amount against another. [8 R. C. L. sec. 209, p. 667; 3 R. C. L. (Perm. Supp.) 2303; 17 C. J. sec. 393, p. 1084.] The amount of the damage is compensatory purely (absent exemplary damages), 8 Ruling Case Law, 431, 434, and has nothing to do with the number of tortfeasors

or the degree of culpability of each, but is based solely on the extent and nature of the injury to plaintiff, and when once determined, must be assessed against each and all who are found liable. The law, as stated, is abundantly sustained by the many cases cited in the textbooks mentioned and we call attention to a few only. Rathbone v. Detroit United R. Co., 187 Mich. 586, 154 N. W. 143; Fox v. Barry, 144 N. Y. Supp. 971, where it was held that the payment of the least of two such verdicts or judgments would satisfy both. [Gill v. Selling, 125 Ore. 587, 262 Pac. 812, 58 A. L. R. 1556; Marriott v. Williams, 152 Cal. 705, 93 Pac. 875, 125 Am. St. Rep. 87.] In the last mentioned case the court said: "In actions against two or more persons for a single tort, there cannot be two verdicts for different sums against different defendants upon the same trial. There can be but one verdict for a single sum against all who are found guilty of the tort. All who are guilty at all are liable for the whole amount of the actual damages arising from the injury inflicted, irrespective of the degree of culpability. [Citing many cases.]" It should be kept in mind if a verdict in one trial is held in abeyance till a second trial and a judgment then entered on both, it is exactly the same as if both verdicts were returned at that time. In contemplation of law, there is but one trial, though parts of it may be at different times and by different juries.

It is also well to keep in mind the general rule that a judgment is an entirety and if it is invalid or erroneous as to one party, it is so as to all, and that the granting of a new trial as to one party destroys the judgment appealed from, though the verdict as to the other may be held in abeyance till after the new trial and a new judgment then entered. This rule as to the judgment being an entirety has been relaxed to some extent in the interest of justice and to facilitate the trial of cases where error is found as to one party only. [Stotler v. Railroad, 200 Mo. 107, 149.] This court there said that it was not necessary to reverse the entire case "where the interests of the parties to the appeal *may be rightfully severed,* where the errors do not affect the parties jointly and where the rights of one party are not dependent upon those of another," but that in such a case the court would affirm as to one party and reverse as to the other. A large number of cases are cited where this or like action could be taken so as to dispose of the whole case without a new trial, or if a new trial was necessary, then all the parties left in the case would be parties to such new trial. [Adair v. Railway Co., 282 Mo. 162, 220 S. W. 920, 928.]

Due regard must be had as to the rights of the defendants as well as the plaintiff, and while plaintiff has the right to sue one or more of the wrongdoers, as he chooses, yet if he does sue and obtain judgment against more than one, he is entitled to but one satisfaction,

and by statute, Section 3268, Revised Statutes 1929, where judgment is rendered against joint tortfeasors, such judgment defendants are subject to contribution as among themselves. [Telephone Co. v. St. Louis, 268 Mo. 485, and cases cited.]

In Mulderig v. Railroads, 116 Mo. App. 655, 672, a suit for personal injuries against two railroads, resulting in a judgent against both companies, and both appealed, the court in an opinion by Judge GOODE held: "We find no prejudicial error against the Transit Company. But the defendants are charged as joint tortfeasors, and the plaintiff's evidence tends to prove that both were guilty as charged. Under our statute if both are found guilty and damages are assessed, the defendants should contribute equally to the payment of the damages and are entitled to contribution among themselves. For this reason the judgment is reversed and the cause remanded."

In Miller v. United Rys. Co., 155 Mo. App. 528, 547, the same court, on similar facts, discussed the effect of this statute allowing contribution among defendants, and held: "It should be said that prima-facie the case may be one where contribution will lie, and if such is true, the judgment is to be reversed as to both defendants though the error in the trial intervened as to one only, for the reason both should be permitted to defend throughout."

Later, in Knox v. M., K. & T. Ry. Co., 199 Mo. App. 64, the Kansas City Court of Appeals considered this same question and held that as the statute allows contribution between judgment defendants, "and this being a fact, each one was . interested in the amount of plaintiff's recovery and each, under the circumstances of that case (Miller v. Transit Co., supra), ought to have the privilege of defending plaintiff's suit throughout. In that case error was found to have been committed against only one of the tortfeasors, but the case was remanded as to both. However, in the Miller case the error was injected into the case by plaintiff. In the case at bar, the defendant Railroad Company was solely responsible for the error committed, and it cannot now take advantage of its own wrong. Having brought the error into the case, it cannot now ask that the judgment be. reversed and remanded for an error of its own commission. . . . However, in view of our statute, Section 2090, Revised Statutes 1909, there can be but one final judgment in the case, and it has been held in a case involving the same dilemma that where it is necessary to reverse and remand a case as to one defendant it must be remanded as to both. Plaintiff being unwilling to dismiss the case as to defendant, The Missouri & Kansas Interurban Railway Company, and thus obviate any necessity of reversing the case, the judgment must be reversed and remanded as to both defendants, and it is so ordered."

In Costello v. Kansas City, 209 Mo. App. 155, 159, the suit was

against the city and a property owner, resulting in a judgment against both. A motion for new trial was filed by each and the trial court sustained that of the property owner and held in abeyance the motion for new trial of the city till after a new trial was had against the property owner. The new trial resulted in favor of the property owner, and the trial court then overruled the motion for new trial of the city and entered judgment against it on the first verdict, from which it appealed. The appellate court approved the action of the trial court, but recognized the right of the defendant city to participate in the new trial against the property owner on account of the city's right to recover back from the property owner any damage it might have to pay, which right was accorded to it, and therefore its rights were not prejudiced. That was true, however, only because the verdict on the second trial was for the defendant property owner, and the case does not consider what the result would have been had the jury on the second trial found against the property owner for a different amount than they found against the city on the first trial. Following the rule of negligence, courts are liable only for errors resulting in injury to the complaining party, but the errors are to be avoided nevertheless.

The St. Louis Court of Appeals touched on this matter lightly in Mount Arbor Nurseries v. Railroad, 217 Mo. App. 31, 273 S. W. 410, 414, where a new trial was granted to one defendant after trial and verdict against both in a tort action, the second trial resulting in a verdict against the defendant, which, by *remittitur*, was made the *same amount* as the first verdict. The court merely approved the rule stated in 29 Cyc. 735 (46 C. J. 78) : "But since their liability is several, as well as joint, most courts now hold that a new trial may be granted to part of them and the *verdict allowed to stand as to the others,* when it can be done *without confusing the issues.*"

In Gerber v Kansas City, 311 Mo. 49, the suit was in tort against two corporations. On the first trial the verdict was for plaintiff against one corporation, but in favor of defendant Kansas City. Both plaintiff and the defendant held liable appealed. On plaintiff's appeal, this court found error and reversed and remanded the case for new trial against the city. No error was found as to the other defendant on its appeal and the judgment was affirmed as to it. On the second trial the plaintiff recovered judgment against the city, but nothing is said as to whether the verdict was for the same or a different amount than the first verdict against the other defendant. This court there conceded that what should have been done on the first appeal was to set aside the first judgment, remand the case for a new trial as to defendant city, and hold in abeyance the verdict against the other defendant until after such new trial, and then

enter a judgment disposing of the whole case as to all parties, but that it did not appear that the defendant city was injured by the procedure had, and "that being true, it was the duty of appellant, if it felt aggrieved by the form our judgment took in disposing of the appeal, to have called our attention thereto in a motion for rehearing or to modify. It is too late to urge the objection now." That case does not discuss or decide the rule that the amount of the verdict and judgment must be the same against each defendant in an action sounding in tort. In order to secure this result, the case must be retried on the question of damages as to both defendants.

As heretofore noted in considering the merits of this case, the case of Clark v. Railroad, 234 Mo. 396, and Clark v. Iron & Foundry Co., 234 Mo. 436, being merely the different appeals in the same case, presented the same questions and matter of procedure as this case, and this court reached the same conclusions, to-wit, that on defendant railroad's appeal from the verdict against it, the trial being without error, the judgment should be affirmed, but that on plaintiff's appeal the judgment in favor of the other defendant Foundry Company should be reversed and remanded for new trial. The final ruling of this court was: "Having discovered no error in the record as to the defendant railway company, the judgment as to it ordinarily should be affirmed. Since, however, the plaintiff appealed from the judgment against it as to the Union Iron & Foundry Company, the co-defendant of the railway company, which was reversed and remanded for a new trial; and since there can be but *one judgment rendered in the same cause,* . . . the *judgment as to the railway company* will, therefore, be reversed and remanded, with directions to the circuit court to hold the judgment [verdict] against the railway company in abeyance until final disposition is made of the case as to the defendant, the Union Iron & Foundry Company, at which time said circuit court is ordered and directed to enter judgment in favor of the plaintiff for the amount of the verdict and six per cent interest to date of said rendition, but said judgment is not to bear interest during the period it stands in abeyance." What was there done, therefore, was to reverse the judgment entered on the verdict in the first trial as to both defendants and remand the cause to the circuit court. That court was directed to retry the case *in toto* as to the Foundry Company and to hold the judgment (verdict) against the Railway Company in abeyance until final disposition is made of the case as to the Foundry Company, and then to enter judgment in favor of the plaintiff for the amount of the verdict, etc., overlooking the fact that there would then be two verdicts to be taken into consideration. Applying this to the present case, there would be one verdict held in abeyance for $10,000 in favor of plaintiff and against the de-

fendant Manufacturing Company; the other verdict on the retrial is likely to be for plaintiff in a different amount against the defendant Railway Company. In that event the court will be confronted with what all the authorities condemn—a verdict or verdicts in plaintiff's favor against different co-defendants in a tort action for different amounts. What steps might then be taken to obviate the error, as by *remittitur* to equalize the verdict, or the dismissal as to one and taking judgment against one only, is suggested in cases cited, but we should not invite the error.

The judgment is therefore reversed and the cause remanded for new trial as to the defendant St. Louis Merchants Bridge Terminal Railway Company, both as to liability and amount of damages; and for new trial as to the defendant Curtis & Company Manufacturing Company on the amount of damages only, the verdict as to such defendant's liability to stand in force, and final judgment be then entered disposing of the case as to all parties. *Seddon* and *Ferguson, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All of the judges concur.